Filed 8/6/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                   )

                                    )

        Plaintiff and Respondent,    )

                                    )          S077033

        v.                       )

                                    )

ENRIQUE PARRA DUENAS,     )

                                  )       Los Angeles County

        Defendant and Appellant.    )    Super. Ct. No. BA109664

_____)

A jury convicted defendant Enrique Parra Duenas of the first degree murder of Los Angeles County Sheriff's Deputy Michael Hoenig. (Pen. Code, §§ 187, 189; all further statutory references are to the Penal Code unless otherwise indicated.) The jury found true the special circumstance allegations that defendant committed the murder to avoid a lawful arrest (§ 190.2, subd. (a)(5)), and that he knew or should have known that the victim was a peace officer performing his duties (§ 190.2, subd. (a)(7)). The jury also found that defendant was armed with and personally used a firearm during the offense. (§§ 1203.06, subd. (a)(1)(A), 12022.5, subd. (a).)

At the penalty phase, the jury returned a verdict of death. The trial court denied defendant's automatic application to modify the verdict (§ 190.4, subd. (e)) and sentenced him to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

1

# I. FACTUAL BACKGROUND

## A. Guilt Phase

### 1. Prosecution case

On the evening of October 29, 1997, defendant used methamphetamine at a "dope house" in South Gate, Los Angeles County. At approximately 1:00 the next morning, defendant was in the same city, riding a bicycle south on Long Beach Boulevard. In his waistband, covered by his shirt, defendant had a loaded .45-caliber Colt semiautomatic pistol. At the corner of Long Beach Boulevard and Seminole Avenue, defendant passed Los Angeles County Sheriff's Deputy Michael Hoenig, who was standing outside his patrol car, talking with a prostitute named Nada Watson.

The sheriff's deputies who patrolled South Gate had recently been instructed by their supervisor to interview cyclists, because the suspect in several recent burglaries had left the scene by bicycle. When defendant rode past Deputy Hoenig on a bicycle, the deputy asked him to stop. Defendant held up his middle finger, said, "Fuck you, cop," and continued riding. Deputy Hoenig then got in his patrol car and pursued defendant. Watson, meanwhile, got in a client's car. Watson asked her client to stop the car near the corner of Seminole Avenue and Pescadero Avenue, so she could watch the encounter between Deputy Hoenig and defendant.

Deputy Hoenig pulled his patrol car to the curb in front of defendant, lights flashing. Defendant tried to ride his bicycle around the patrol car but fell off. Watson's client then told Watson to get out of his car, which she did, and the client drove away. At about the same time, Watson heard a gunshot. Defendant had fired the shot from behind the patrol car, on the passenger side; the bullet shattered the right rear window of the car and hit Deputy Hoenig's right hand.

2

Deputy Hoenig managed to draw his gun and began to exit the patrol car. Defendant walked around the rear of the car, from the passenger side to the driver's side, and as Nada Watson watched, defendant shot Deputy Hoenig three more times. Watson saw defendant stand near the patrol car's rear tire, hold the gun with both hands, and fire at Deputy Hoenig, who was then halfway out of the car; defendant then fired two more shots at Deputy Hoenig. One of the three bullets went through Deputy Hoenig's lower leg, one went through his chest, and one was stopped by his bulletproof vest. The bullet that pierced Deputy Hoenig's chest entered below the throat, went through his aorta, and exited his lower back, causing blood loss that led to unconsciousness within 10 seconds and death within a minute.

Defendant abandoned his bicycle and fled on foot. As he fled, he turned and fired three more shots, but those shots did not hit the patrol car or Deputy Hoenig. Deputy Hoenig's body lay on the street near his patrol car, his right arm extended and his gun, unfired, in his right hand.

The sound of the gunshots awoke three people who lived nearby: Sandra Carranza, Luis Gomez, and Reyes Estrella Quintero. From her bedroom window, Carranza saw a man stumble by a police car near her driveway. She then heard gunshots and saw flashes around the man's upper body, after which the man ran west on Seminole Avenue. Gomez (Carranza's husband) also saw a man stumble in the driveway and then flee. Quintero heard shots and the words "Fucking police," but he did not see the shooter.

Soon after the shooting, a sheriff's deputy and his dog found defendant hiding, unarmed, by a garage in the neighborhood; the dog bit defendant and pulled him from his hiding place.

Sergeant Jack Ewell of the Los Angeles County Sheriff's Department took defendant into custody and asked him to help find the gun to ensure that it would

3

not be used to hurt anyone. Defendant led Sergeant Ewell to a nearby yard. As he did so, defendant said without prompting, "Why don't you just kill me[?] I deserve to die for what I did." Defendant added: "I don't know why I did that. That cop was writing a ticket and I just started shooting him."

Retrieved from the yard to which defendant led Sergeant Ewell was a .45-caliber semiautomatic pistol bearing defendant's fingerprints. Near Deputy Hoenig's patrol car were seven .45-caliber shell casings. Testing later confirmed that the shell casings had been ejected by the gun that was found in the yard near defendant's hiding place.

After finding the gun, officers drove eyewitnesses Watson, Gomez, and Carranza to where defendant was being held, near the place of his arrest. Each witness identified defendant as the man seen next to the patrol car during the shooting, or fleeing the area seconds later. Each witness also identified defendant in court.

Sergeant Ewell transferred custody of defendant to Sergeant Isaac Aguilar, who advised defendant of his constitutional rights to remain silent and to have an attorney present. Defendant expressly waived those rights and agreed to talk to Aguilar and to Detective Martin Rodriguez. Aguilar and Rodriguez then drove defendant to a hospital for treatment of his dog bite and to have a blood sample taken. In the car, Aguilar questioned defendant, and Rodriguez recorded the conversation.

At the hospital, Detective Rodriguez heard defendant tell a doctor, "I think I shot a police officer." After leaving the hospital, Rodriguez and Aguilar took defendant to the homicide headquarters of the Los Angeles County Sheriff's Department and interviewed him further, videotaping the interview.

Defendant told the officers that before the shooting, he had been "tweaking" (using methamphetamine). He last took the drug approximately two to

4

three hours before the shooting.  He was carrying a .45-caliber Colt semiautomatic pistol loaded with seven or eight bullets.  He had stolen the gun from his uncle and had carried it for three days as protection from gang members.

Defendant said that while he was riding his bicycle on Long Beach Boulevard, he encountered Deputy Hoenig.  Defendant ignored Hoenig's request to stop because, defendant explained, he was tweaking and carrying a gun.  Defendant's account of what happened next was inconsistent; he told his interviewers that, because of his drug use, he could not remember the events exactly.

According to defendant, Deputy Hoenig tried to run him over or cut him off with the patrol car.  Defendant then fell off the bicycle.  Defendant claimed that the deputy got out of the patrol car and aimed a gun at him.  Defendant repeated many times that the deputy had shot first, and that defendant had returned fire.  Once, however, defendant said that he shot first.  At trial, the evidence proved without dispute that Deputy Hoenig had never fired a shot.

In his videotaped interview, defendant acknowledged that he had fired seven to nine shots at the deputy.  He said that he heard the deputy cry out in pain, but he also said that he had not known whether he hit the deputy.  Defendant said that he shot the deputy because he did not want to go to jail for having a gun, he was scared, and he thought he would get away without being caught.

During the interview, defendant seemed alert and aware of what was going on.  Detective Rodriguez had experience with users of methamphetamine and thought defendant was under the influence of that drug.  Rodriguez stated that the drug can speed up the brain's operation but usually does not distort a user's reasoning.  A toxicologist testified that a blood sample taken from defendant three to four hours after the shooting contained methamphetamine.

5

Over defendant's objection, Dr. Carley Ward (an expert in biomechanics) and her son Parris Ward (who creates computer graphics) described and then showed the jury a four-minute computer animation. Using the animation to illustrate her testimony, Dr. Ward offered these opinions as to how the shooting occurred: Defendant fired the first shot from behind the patrol car on the passenger side, hitting Deputy Hoenig's hand. Defendant then moved around the back of the patrol car to the driver's side and, as Deputy Hoenig put his feet on the ground to step out of the car, fired the second shot into the deputy's leg. Defendant then stepped forward and, standing four to six feet away, fired the third shot into Deputy Hoenig's chest. Finally, defendant fired the fourth shot into Deputy Hoenig's back as the deputy fell to, or lay on, the ground.

Dr. Eugene Carpenter, who performed the autopsy on Deputy Hoenig, testified about Hoenig's fatal chest wound. The bullet had entered at an angle, indicating two possible scenarios: Either defendant fired the shot parallel to the ground and Deputy Hoenig was leaning forward at a 45-degree angle, or defendant fired the shot at a downward angle and Deputy Hoenig was on his knees.

### 2. *Defense case*

The defense offered no evidence at the guilt phase.

### B. Penalty Phase

### 1. *Prosecution case*

To show victim impact, the prosecution offered testimony of two of Deputy Hoenig's brothers, his parents, his longtime girlfriend, and his former partner in the sheriff's department.

Deputy Hoenig's brother Steven had been very close to him; both had belonged since childhood to the "Odd Fellows," a community-service organization. After the murder, Steven Hoenig suffered recurring nightmares, and

he had to take time off from college. Another brother, David Hoenig, testified that he was greatly affected by the death of his brother, who had been his moral compass. Deputy Hoenig's girlfriend of eight years, Debra Hite, testified that Deputy Hoenig had been her best friend.

Deputy Hoenig's mother testified about her concerns when he was assigned to a solo patrol in a dangerous area, and she mentioned her unsuccessful efforts to cope with her son's death by attending the meetings of a survivors' group. Deputy Hoenig's father testified that his family would "never be the same." He said he did not "know of anybody that [his son] talked with that he didn't like, and that didn't like him," and he added that Deputy Hoenig kept stuffed animals in his patrol car to give to children involved in traffic accidents. The latter point was also stated by his former partner in the sheriff's department, Deputy Tressa Gunnels, who additionally mentioned that after Deputy Hoenig's killing, South Gate citizens created an impromptu crime scene memorial and initiated a "Stop the Violence" campaign.

2. *Defense case*

Defendant was born in Mexico in 1974 and moved to California around 1991, when he was about 17 years old. Three of his eight siblings lived in California; the rest of his family lived in Mexico. In California, defendant began using methamphetamine.

The jury heard from four of defendant's siblings, his brother-in-law, an uncle, a cousin, and a friend. Several of them testified that they had never seen defendant act violently, associate with a gang, carry a gun, or get into trouble with the law.

Defendant's eldest brother, Juan Parra, described defendant as good hearted and nonviolent. Defendant's brother Martin Parra, who came from Mexico to

testify, said that if defendant was guilty, it was because of drugs. Defendant's sister Blanca Navarro, who had lived with defendant most of her life, described him as a generous child. Later in life, if she scolded him, he "never answered . . . back"; instead, he lowered his head and cried at times. Blanca's husband, Luis Navarro, an independent contractor for a package delivery service, employed defendant from 1991 through 1995 and testified that defendant worked very hard.

Defendant's uncle Eliseo Villa testified that defendant was "very humble" and hard-working, and that defendant "didn't know what he was doing" at the time of the killing "because he was under the influence of drugs." Villa's daughter Maria described defendant as having a good heart. Defendant's close friend Fernando Solano described defendant as "a nice person." In Solano's view, defendant was "really sorry for what he did, even though he might not have shown it . . . yet." Solano said that defendant had wanted to stop using methamphetamine but had not been able to do so.

## II. DISCUSSION

### A. Pretrial and Guilt Phase Issues

#### 1. Excusal of prospective jurors for cause

The trial court excused three prospective jurors for cause, finding that their views on the death penalty would prevent or substantially impair their performance of their duties as jurors. Defendant contends on appeal that these excusals denied him due process of law and a trial by an impartial jury, in violation of the Sixth and Fourteenth Amendments of the federal Constitution, and article I, section 16 of the California Constitution.

"[T]he law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or

8

substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath. [Citations.]" (*People v. Blair* (2005) 36 Cal.4th 686, 741.) When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence. (*People v. Wilson* (2008) 44 Cal.4th 758, 779 (*Wilson*); see *Wainright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*); accord, *People v. Lewis* (2008) 43 Cal.4th 415, 483 (*Lewis*) [trial court's determination as to prospective juror's true state of mind is binding].)

### a. Prospective Juror No. 4593

Prospective Juror No. 4593's questionnaire reflected ambivalence and doubt about his ability to vote for the death penalty. Asked to describe his "general feelings about the death penalty," he wrote: "Have mix feeling. Not sure can decide guilty or not guilty because it concerns people's life." In response to the question, "Regardless of your views on the death penalty, would you[,] as a juror, be able to vote for the death penalty . . . if you believed, after hearing all the evidence, that [it] was appropriate?," he wrote: "Not sure." When asked, "Do you have any conscientious objections to the death penalty which you believe might impair your ability to be fair and impartial in a [capital] case . . . ?," he circled "YES." As for whether he could "accept the responsibility to decide between death and life without the possibility of parole," he checked "No," adding: "I would constantly ask myself . . . 'did I made the right decision.' "

During voir dire, Prospective Juror No. 4593 gave conflicting, equivocal answers as to whether his feelings about the death penalty would prevent or substantially impair the performance of his duties as a juror. The trial court asked the prospective juror to imagine that the case had reached the penalty phase, and

9

that he was sitting as a juror. The trial court then asked whether Prospective Juror No. 4593 "would not exercise [his] right to the option [of choosing either death or life without the possibility of parole], but rather would not impose death." The prospective juror gave this hesitant answer: "It's hard for me, even though I know he killed someone . . . because my judgment — I can't put people to death . . . because my vote . . . even though I hear and, yes, I agree he killed this person, and maybe I agree with — I heard all the evidence, but my conscience — still kind of hard for me to . . . , because of my vote, I able to put this person to death." Nevertheless, when defense counsel asked Prospective Juror No. 4593 if he could "vote for death," he said that he could do so:

"Prospective juror 4593: If all the factor really convince me, I do, but I still will feel guilty. Even though I voted yes, but probably later on I would think because my vote . . . I would cause a person's death, but I would still vote, yes.

"[Defense counsel]: Okay. So you could vote death?

"Prospective juror 4593: Yes."

Then, at the end of lengthy questioning by the prosecutor, Prospective Juror No. 4593 equivocated once again: "I will still give you kind of like an in between answer, because . . . I thought about it over weekend, and I really think I still have a mixed feeling right now. So, I probably answer I still cannot make — probably cannot make a decision."

Defendant does not view Prospective Juror No. 4593's answers as equivocal or conflicting. Defendant emphasizes that the prospective juror answered one of defense counsel's queries by stating unequivocally that he could and would vote for death if "the factor[s] really convince[d]" him, whereas he never made a similarly unequivocal statement that he could *not* and would *not* vote for death.

10

For his answers to be considered conflicting, however, it was not necessary for Prospective Juror No. 4593 to make an unequivocal statement directly contradicting his statement that he could vote for death.  Many prospective jurors, as the high court has noted, " 'simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these [prospective jurors] may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 7, quoting *Witt*, *supra*, 469 U.S. at pp. 424–425.)  The lack of an unequivocal statement by Prospective Juror No. 4593 expressing an inability to vote for death did not deprive the trial court of discretion to find, after considering the prospective juror's answers, demeanor, and tone, that his feelings about the death penalty would substantially impair the performance of his duties as a juror.

Both before and after defense counsel's questioning, Prospective Juror No. 4593 consistently expressed his inability, despite having taken time to search his conscience over the weekend, to decide whether he could vote for death. Comments that a prospective juror would have a "hard time" or find it "very difficult" to vote for death reflect "a degree of equivocation" that, considered "with the juror's hesitancy, vocal inflection, and demeanor, can justify a trial court's conclusion . . . that the juror's views would ' "prevent or substantially impair the performance of his duties as a juror . . . ." ' " (*People v. Roldan* (2005) 35 Cal.4th 646, 697, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421 and fn. 22.)  On appeal, such a finding binds us.  (See, e.g., *People v. Jones* (2003) 29 Cal.4th 1229, 1247 [although a prospective juror "ultimately stated . . . that he could vote to impose the death penalty 'in the right case,' " his prior "sharply conflicting statements" made the trial court's finding as

11

to his true state of mind "binding on us"]; see also *Lewis*, *supra*, 43 Cal.4th at p. 483.)

Defendant relies on the high court's statement in *Witherspoon v. Illinois* (1968) 391 U.S. 510 that prospective jurors cannot be excluded simply because they "would not 'like to be responsible for . . . deciding somebody should be put to death' " (*id.* at p. 515), for " '[e]very right-thinking man would regard it as a painful duty to pronounce a verdict of death upon his fellow-man' " (*ibid.*, fn. 8, quoting *Smith v. State* (1877) 55 Miss. 410, 413). Defendant also quotes similar language in cases decided after *Witherspoon* but before the high court's 1985 decision in *Witt*, *supra*, 469 U.S. 412. (See, e.g., *People v. Bradford* (1969) 70 Cal.2d 333, 347 ["The decision that a man should die is difficult and painful, and veniremen cannot be excluded simply because they express a strong distaste at the prospect of imposing that penalty."].) But *Witt* clarified that the standard for excusal of a prospective juror is whether the prospective juror's views would " 'prevent *or substantially impair* the performance of his duties as a juror . . . .' " (*Witt*, *supra*, at p. 424, italics added.) In this case, the trial court excused Prospective Juror No. 4593 not just because he found the prospect of voting for death *painful or distasteful*, but because he repeatedly expressed doubt and equivocated as to whether he could vote for death *at all*. The trial court could construe those statements, in light of the prospective juror's demeanor and tone, to mean that his views would substantially impair the performance of his duties as a juror.

Defendant also relies on our decision in *Wilson*, *supra*, 44 Cal.4th 758. *Wilson* addressed three types of juror excusal. Two of those types are subject to less deferential appellate review than the type of excusal at issue here: (1) excusals of prospective jurors based solely on written answers to a questionnaire (*id.*, at pp. 781–790), and (2) excusals of seated jurors based on

12

comments made during deliberations (*id.* at pp. 813–841). Most of the language defendant quotes in his brief is from those two inapposite parts of the decision. Defendant quotes only one passage from the part of *Wilson* that is on point here: In cases involving excusals during voir dire, *Wilson* requires trial courts to make "a conscientious attempt to determine a prospective juror's views regarding capital punishment to ensure that any juror excused . . . meets the constitutional standard" for excusal. (*Id.* at p. 779.) The record here shows that the trial court made such a conscientious attempt.

In sum, the authorities defendant cites are not on point. After giving appropriate deference to the trial court's determination regarding Prospective Juror No. 4593's state of mind, we find the trial court's ruling fairly supported by the record and conclude that the trial court did not err in excusing the prospective juror. (See *People v. McDermott* (2002) 28 Cal.4th 946, 981–982 (*McDermott*); *People v. Barnett* (1998) 17 Cal.4th 1044, 1114–1115 (*Barnett*).)

### b. Prospective Juror No. 5637

Prospective Juror No. 5637's written questionnaire answers were inconsistent. Some stated an absolute refusal to apply the death penalty, but others were uncertain or neutral. As to his general feelings, the prospective juror wrote, "Do not believe in death penalty." He checked "YES" in response to a question asking whether he was "so strongly against the death penalty" that "no matter what the evidence shows, [he] would refuse to vote for guilt . . . or refuse to find the special circumstances true." He checked the same "YES" answer after a question asking whether, in a penalty phase, he "would always vote against death, no matter [the] evidence of aggravation or mitigation." But when asked whether he could set aside his personal views and whether, "as a juror, [he would] be able to vote for the death penalty," he answered, "Don't know." Further, when asked

13

whether he had "any conscientious objections to the death penalty" that he believed "might impair [his] ability to be fair and impartial in a [capital] case," he circled "NO."

Prospective Juror No. 5637's oral answers were also conflicting. When the trial court asked, "under no circumstance would you impose the death penalty?," he said, "I — right now I don't think I would," but when asked moments later whether he could "set aside [his] personal belief and impose the death penalty," he said, "I think I could, yes, Your Honor." Pressed for a definitive response after further equivocal answers, he answered, "Yes, I could." Asked about his written answers in which he had said that he would automatically vote against guilt and death, he said he could change those answers to "no."

Prospective Juror No. 5637's responses to counsel were equally mixed. When defense counsel asked him whether he could consider both death and life without the possibility of parole, he replied, "Yes, I'd be able to consider both." Later, the prosecutor said to the prospective juror, "you are a sincere person that's examined your conscience and . . . because you don't believe in the death penalty, you couldn't pull the switch." The prosecutor then asked, "does that sum up your feelings?" Prospective Juror No. 5637 replied, "I think so, sir. Yes." On further questioning about whether he could vote for death, the prospective juror said, "I guess I could do it" but "I would rather not." Finally, when asked, "Do you think you are the right . . . juror to sit on a capital case . . . ?," the prospective juror answered, "No." The trial court granted the prosecutor's challenge for cause.

Defendant's claim of error as to Prospective Juror No. 5637 relies in significant part on the same principles, and fails for the same reasons, as his claims of error regarding the excusal of Prospective Juror No. 4593 (see pp. 10–12, *ante*). Although Prospective Juror No. 5637 twice unequivocally said that he could vote for death, he unequivocally wrote on his questionnaire that he could not. And in

14

response to other questions on voir dire, the prospective juror was much more equivocal. In such circumstances, the trial court's finding as to the prospective juror's true state of mind is supported by substantial evidence and binding on appeal. (*Lewis*, *supra*, 43 Cal.4th at p. 483.)

Defendant contends that the prosecutor asked Prospective Juror No. 5637 two improper questions: (1) whether he could "pull the switch," which — defendant asserts — alluded to the electric chair and caused the prospective juror to imagine himself as defendant's executioner, and (2) whether he thought he was the "right . . . juror" for a capital case, which defendant contends called for a legal conclusion that was not the prospective juror's responsibility to make.

Defendant's trial counsel did not object to either question, so the claims are forfeited. (See *People v. Salcido* (2008) 44 Cal.4th 93, 153.) In any case, neither question exceeded the scope of permissible voir dire. Regarding the prosecutor's use of the "pull the switch" metaphor, this court rejected a similar argument in *People v. Lynch* (2010) 50 Cal.4th 693, 728–734 (*Lynch*). There, the prosecutor asked a prospective juror whether she could tell the defendant that she was " 'voting to impose the death penalty, knowing that that is going to be the first step which leads to his execution by lethal gas, strapped in a chair in the gas chamber in San Quentin sometime in the future . . . .' " (*Id.* at p. 729.) The prosecutor in *Lynch* also asked: " 'Your vote for death, you are one-twelfth of the thing that's going to put him in that gas chamber, you realize that?' " (*Ibid.*; see also *id.* at pp. 729–731 [similar questions].) On appeal, the defendant in *Lynch* argued that the prosecutor had improperly "invoked 'graphic images, and inflammatory language to cause [the prospective jurors] to recoil and shrink from the task at hand,' " but we rejected that claim, holding that the prosecutor had "simply inquired whether the jurors would be able to affirm in open court a vote for a death verdict." (*Id.* at p. 734.)

15

Here, the prosecutor used the "pull the switch" metaphor to link the vote a juror must cast to the ultimate act of taking defendant's life. In *Lynch*, by contrast, the prosecutor described the vote as " '*the first step* which leads to [the defendant's] execution by lethal gas, strapped in a chair in the gas chamber.' " (*Lynch*, *supra*, 50 Cal.4th at p. 729, italics added.) But this distinction is not so significant, nor the prosecutor's question here so inherently upsetting, as to lead us to the conclusion that the trial court abused its discretion when it did not intervene on its own initiative to disallow the question, or to admonish the prosecutor. Accordingly, we reject defendant's claim of error.

As for the question about whether Prospective Juror No. 5637 thought he was "the right . . . juror to sit on a capital case," hearing a prospective juror's answer to that question might help a trial court accurately assess the person's state of mind. Nothing in the record before us suggests that the trial court abdicated its responsibility and relied on the prospective juror's assessment of his fitness instead of the court's own assessment.

Giving appropriate deference to the trial court's finding regarding Prospective Juror No. 5637's state of mind, we conclude that the court did not err in excusing him. (See *McDermott*, *supra*, 28 Cal.4th at pp. 981–982; *Barnett*, *supra*, 17 Cal.4th at pp. 1114–1115.)

### c. *Prospective Juror No. 6611*

Prospective Juror No. 6611's written questionnaire answers reflected no opposition to or concern about his ability to vote for death. On voir dire, however, his initial answers were equivocal. His hesitant demeanor led to more probing questions, and his difficulty in responding to those followup questions revealed a deep uncertainty as to whether he could vote for death. The trial court then, on its own motion, excused the prospective juror.

16

Prospective Juror No. 6611 answered the court's initial oral queries about his ability to vote for death, saying, "I think so" and "I believe so." When defense counsel took over the questioning, counsel alluded to the prospective juror's visible lack of certainty. Defense counsel asked, "could you vote death?," and the prospective juror said, "I think I — yes, I think." Counsel replied: "You're sort of shaking your head. If you say you can't, that's fine." The prospective juror then said, "I think I could do what would be called upon me," but "this is a big case so I'm a little nervous." When defense counsel asked the prospective juror again whether he could vote for death, he said, "Yes" — his first unequivocal response.

When the prosecutor began his questioning, he too alluded to Prospective Juror No. 6611's demeanor and added that "voting death is like you pushing the button." The prosecutor asked: "[W]ith your hesitancy . . . , can you pull the trigger? Can you have your finger on the button [and] say[, ']I condemn you to death[']?" The prosecutor then posed this query: "[A] number of people . . . say[,] [']I support the death penalty, . . . but I can't make that decision.['] Are you in that group?" Prospective Juror No. 6611 made no response to any of those questions.

The trial court then encouraged Prospective Juror No. 6611 to say whatever he felt, reassuring him that "there is no right or wrong answer" and that he should not "try to satisfy" the court and counsel. The prospective juror gave a halting, inconclusive answer that included this comment: "I feel that I could weigh . . . everything brought upon me, but . . . you just never know until you get there." The prosecutor asked another question, and when the prospective juror again made no response, this dialog ensued:

"The Court: There has been a substantial silence and that's because you're mulling over in your mind whether or not you could or could not impose the death

17

penalty; is that right? And at this point in time you still haven't reached a conclusion. Is that a fair answer?

"Prospective juror 6611: True. I'm kind of hitting blank just with —

"The Court: Okay. I think I'm going to make a finding that the juror's response does demonstrate that his views would substantially impair his [performance of his] duties as a juror . . . ."

Defendant's challenge to that finding fails largely for the same reasons as his challenge to the trial court's finding regarding Prospective Jurors No. 4593 and No. 5637 (see pp. 10–12, 14–15, *ante*): Although Prospective Juror No. 6611 made one unequivocal statement that he could vote for death, his other statements were equivocal (including a repeated inability to say whether he could vote for death). When a prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts. (*Lewis*, *supra*, 43 Cal.4th at p. 483.) Here, the trial court's finding as to Prospective Juror No. 6611's state of mind is supported by substantial evidence, and therefore final.

Defendant notes Prospective Juror No. 6611's admission of nervousness. He argues that the prospective juror's problem in answering voir dire questions stemmed from that nervousness, and that nervousness is an inappropriate basis for excusing a prospective juror. Defendant's argument fails. Nervousness is a factor that the trial court properly may consider when evaluating a prospective juror's demeanor and is highly relevant to the court's determination of the prospective juror's state of mind. (See *People v. Clark* (2011) 52 Cal.4th 856, 897.)

Defendant claims the trial court abused its discretion as to the scope of voir dire by allowing the prosecutor to tell Prospective Juror No. 6611 that voting for death "is like you pushing the button," and by allowing him to ask whether the

prospective juror could "pull the trigger" or have his "finger on the button [and] say, [']I condemn you to death.['] "

Defendant's trial counsel did not object to those questions, so defendant's claim is forfeited. (*People v. Salcido*, *supra*, 44 Cal.4th at p. 153.) In any case, defendant's challenge to the "push the button" and "pull the trigger" metaphors fail for the same reason as his similar claim regarding the "pull the switch" metaphor used in questioning Prospective Juror No. 5637. (See pp. 15–16, *ante*, discussing *Lynch*, *supra*, 50 Cal.4th at pp. 728–734.)

Giving due deference to the trial court's determination regarding Prospective Juror No. 6611's state of mind, we conclude that the court did not err in excusing him. (See *McDermott*, *supra*, 28 Cal.4th at pp. 981–982; *Barnett*, *supra*, 17 Cal.4th at pp. 1114–1115.)

### 2. *Claim of error in admitting a computer animation illustrating experts' opinions about the shooting*

After a preliminary hearing to decide its admissibility (Evid. Code, § 402), the trial court admitted as demonstrative evidence a four-minute animation illustrating the opinions of two experts regarding how the shooting occurred. The animation was created by Dr. Carley Ward and her son Parris Ward. Dr. Ward is an expert in the biomechanics of injury. Biomechanics, she explained, entails the application of engineering principles and physics to "the human structure." Mr. Ward has a background in photography, law, and computer graphics, as well as experience creating computer animations for use in court.

In creating the animation, Parris Ward relied on a variety of sources, including police and coroner reports and photographic records; precise measurements that he took of the crime scene, using a surveyor's tool; his and Dr. Ward's examinations of Deputy Hoenig's patrol car and the deputy's bulletproof vest; the Wards' personal consultations with the coroner who did the

19

autopsy and with the expert who analyzed the blood spatters found in and on the patrol car; and Dr. Ward's expertise in biomechanics.

Before the animation was played to the jurors, Parris Ward told them that the animation "doesn't tell you, because it's from computer, that this had to happen this way"; instead, it is "an illustrative tool for explaining concepts."  The trial court also gave the jury this cautionary instruction:  "What you're going to see is an animation based on a compilation of different expert opinions.  This is similar to the expert using charts or diagrams to demonstrate their respective opinion.  *This is not a film of what actually occurred or an exact re-creation.  It is only an aid to giving you a view as to the prosecution version of the events based upon particular viewpoints and based upon interpretation of the evidence.*"  (Italics added.)

Defendant contends that the trial court abused its discretion in admitting the animation.  He argues that the animation reflects speculation about key aspects of the shooting of Deputy Hoenig, gave the prosecution's case an unwarranted aura of scientific certainty, and was cumulative of other evidence.

Before analyzing those arguments, we describe the animation in question.

### a.  The animation

The animation shown to the jury is a series of mostly still images.  The images are drawn to give the impression of three-dimensional space.  Although the objects and figures in the images rarely move, the viewer's perspective moves within the images, allowing the viewer to see the objects and figures from different angles.  The figures are drawn in a generic fashion; their facial features are indistinct and expressionless.

The animation begins with an image of the street where Deputy Hoenig was shot, showing the patrol car pulled over to the right, partly blocking a driveway.

The viewer's perspective then shifts to the driver's side of the patrol car. From that vantage point, a fallen bicycle and a standing figure are visible on the sidewalk beyond the patrol car. A red line crosses the image, extending from the standing figure's outstretched hand into the car, showing the alleged path of the first bullet. The viewer's perspective shifts to a spot near the standing figure and then pans along the red line, showing the bullet's trajectory through the rear passenger window, through the driver's right hand, and through the windshield. The words "Bullet Goes Through Hand" appear, superimposed over the animation. Then the animated scene is replaced by a color autopsy photo of Deputy Hoenig's hand, showing entry and exit wounds.

The animated scene reappears and the viewer's perspective shifts to the patrol car's passenger side. The driver's door opens. The shooter is now shown standing in the street, near the driver's side rear tire. The words "Shot #2 Lower Left Leg" appear, superimposed over the animation. The perspective then shifts again, to that of the shooter. A figure depicting the driver is shown sitting in the driver's seat, with his feet on the ground outside the car, as if getting ready to step out. A red trajectory line extends into the left calf of the driver, showing the alleged path of the second bullet. The perspective then shifts again, to show the red line entering the front and exiting the back of the driver's calf. Words appear labeling these two wounds, followed by this sentence: "Correlation of entry wound to hole in pants indicates that knee was bent when leg was shot." The scene is then replaced by a color autopsy photo of Deputy Hoenig's calf, showing entry and exit wounds.

Again the animated scene reappears, now viewed from a point above the sidewalk on the passenger side of the patrol car. The viewer sees the driver and shooter standing on the far side of the car. Only the driver's torso is visible. The torso is then shown moving, as if the driver is falling face first. The shooter

21

disappears, and he reappears standing adjacent to the car's front door. The words "Shot #3 Upper Chest" appear, and a trajectory line extends from the shooter's outstretched arm toward the deputy.

The computer-generated street scene is next replaced by a three-dimensional image of a head and torso, shown leaning forward. A red line extends downward into a spot on the upper chest, through the torso, and out the lower back, thus showing the alleged path of the third bullet. Words appear describing the locations of the entry and exit wounds, and the entire image rotates 360 degrees. The animated image of the head and torso is then replaced by color autopsy photos of Deputy Hoenig's chest and back, showing first the entry wound and then the exit wound.

Again the street scene reappears, with the viewer's perspective still on the car's passenger side. The driver's torso is shown falling forward until it is wholly obscured by the car. The shooter disappears and then reappears near the car's front wheel. The words "Shot #4 Stopped by Vest" appear, and a red trajectory line extends from the shooter's outstretched arm toward a spot on the ground that is obscured by the car. Then the scene is replaced by a color autopsy photo of Deputy Hoenig's back, showing a red abrasion labeled "Impact Point."

The animation next shows the fifth, sixth, and seventh shots, each of which hit vehicles parked nearby, causing no injuries. With respect to each shot, the alleged location of the shooter is depicted (now at different places in front of the car), and a red line is again used to show the alleged path of the bullet. Then the perspective shifts to a point high above the patrol car, looking down. Seven small circles are used to mark places where shell casings were found, indicating the seven places from which the shots were likely fired.

The animation then ends.

*b. Admissibility of computer-generated evidence*

Courts and commentators draw a distinction between computer animations and computer simulations. (Annot., *Admissibility of Computer-Generated Animation*, 111 A.L.R.5th 529, 538–539, § 2[a] (2003).) "Animation is merely used to illustrate an expert's testimony while simulations contain scientific or physical principles requiring validation. [Citation.] Animations do not draw conclusions; they attempt to recreate a scene or process, thus they are treated like demonstrative aids. [Citation.] Computer simulations are created by entering data into computer models which analyze the data and reach a conclusion." (*Harris v. State* (Okla.Crim.App. 2000) 13 P.3d 489, 494, fn. 6, citing *Clark v. Cantrell* (S.C. 2000) 529 S.E.2d 528, 537.) In other words, a computer animation is demonstrative evidence offered to help a jury understand expert testimony or other substantive evidence (*People v. Hood* (1997) 53 Cal.App.4th 965, 969 (*Hood*)); a computer simulation, by contrast, is itself substantive evidence. (*Commonwealth v. Serge* (Pa. 2006) 896 A.2d 1170, 1176–1177 & fn. 3 (*Serge*); *State v. Stewart* (Minn. 2002) 643 N.W.2d 281, 292–293 (*Stewart*).)

Courts have compared computer animations to classic forms of demonstrative evidence such as charts or diagrams that illustrate expert testimony. (E.g., *Hood*, *supra*, 53 Cal.App.4th at p. 969; *Serge*, *supra*, 896 A.2d at p. 1176.) A computer animation is admissible if " 'it is a fair and accurate representation of the evidence to which it relates . . . .' " (*Dunkle v. State* (Okla.Ct.Crim.App. 2006) 139 P.3d 228, 247 (*Dunkle*), quoting *Harris v. State*, *supra*, 13 P.3d at p. 495; accord, *Serge*, *supra*, 896 A.2d at pp. 1178–1179; *Stewart*, *supra*, 643 N.W.2d at p. 293.) A trial court's decision to admit such demonstrative evidence is reviewed for abuse of discretion. (See *People v. Mills* (2010) 48 Cal.4th 158, 207; *People v. Williams* (1997) 16 Cal.4th 153, 213–214.) A computer simulation, by contrast, is admissible only after a preliminary showing that any "new scientific technique"

23

used to develop the simulation has gained "general acceptance . . . in the relevant scientific community." (*People v. Kelly* (1976) 17 Cal.3d 24, 30; see also *Hood*, *supra*, 53 Cal.App.4th at pp. 969–970.)

In this case, the parties agree that the evidence was a computer animation, not a simulation, and therefore it was admissible if it was "a fair and accurate representation of the evidence." (*Dunkle*, *supra*, 139 P.3d at p. 247.) None of defendant's arguments indicates an abuse of discretion by the trial court in admitting the animation (see pt. II.A.2.c., *post*); in any event, any error was harmless (see pt. II.A.2.d., *post*).

### c. The trial court did not abuse its discretion in admitting the animation

The animation was relevant to the question of premeditation and deliberation. It illustrated the theory of the prosecution's expert witness Dr. Carley Ward that defendant fired a series of shots, from different locations, including one shot that was fired at close range, while Deputy Hoenig was falling forward, or while he was kneeling on the ground. It further illustrated Dr. Ward's theory that defendant continued to shoot after Deputy Hoenig was lying on the ground, again suggesting premeditation and deliberation. Defendant offers three arguments for why the trial court nevertheless abused its discretion in admitting the animation.

### i. The animation is not inadmissibly speculative

Defendant contends that the animation is speculative regarding two aspects of the shooting: the locations from which he fired the shots and the sequence in which he did so.

As set forth above, a computer animation is not substantive evidence used to prove the facts of a case; rather it is demonstrative evidence used to help a jury to understand substantive evidence. In a case like this one, where the animation

24

illustrates expert testimony, the relevant question is not whether the animation represents the underlying events of the crime with indisputable accuracy, but whether the animation accurately represents *the expert's opinion* as to those events.

According to defendant, the animation is speculative because it shows the shooter firing from the seven locations where shell casings were found, which might not be the locations from which defendant actually fired the shots. Whatever uncertainty may exist as to the actual facts in this case, the animation accurately illustrates *the opinions of the prosecution's experts* with regard to how the murder occurred, and that is all it purported to do. As noted earlier, the trial court made clear to the jury the limited purpose of the animation, saying: "This is *not a film of what actually occurred* or an exact re-creation. It is only an aid to giving you a view as to *the prosecution version of the events* based upon particular viewpoints and based upon interpretation of the evidence." (Italics added.)

Moreover, the expert opinions reflected in the animation were based on substantive evidence found at the crime scene and in the autopsy. Deputy Patricia Fant, a firearms expert from the sheriff's department crime laboratory, authenticated crime scene photographs identifying the seven places where casings were found. She told the jury that the semiautomatic pistol used to shoot Deputy Hoenig ejects an empty shell casing each time it is fired. She agreed that one "would . . . expect to find a shell casing on the ground near where [a shooter] was [standing] if [he] fired a semiautomatic pistol," although she also noted that an ejected shell casing can bounce. Dr. Carley Ward and her son Parris, in turn, testified that the animation depicts the shooter firing from each of the three general areas where casings were found, and that it depicts the first four shots as fired from the four locations where casings were found.

25

Defendant argues that the animation's depiction of where the shooter stood is speculative because officers or paramedics may have kicked or otherwise inadvertently moved shell casings from their original locations as they tried to save Deputy Hoenig's life. But even if some shell casings were moved after they initially fell to ground, that possibility does not affect the animation's admissibility for the limited purpose of illustrating *the opinion of the prosecution's experts* about what the physical evidence showed. Although defendant frames his argument as a challenge to the admissibility of the animation, his real quarrel is with the conclusions the prosecution's experts drew from the evidence, not with the accuracy with which the animation depicted those conclusions. More specifically, his argument is that the location of the shell casings is not indicative of where the shots were fired, a point that he was free to develop at trial. Because the animation accurately depicted the conclusions of the prosecution experts who testified, defendant's argument fails.

Defendant also argues that the animation is speculative as to the *sequence* of the shots. Defendant disputes the Wards' decision to depict *first* the three shots fired from the driver's side of the patrol car, and to depict *next* the three shots fired from in front of the car. He also disputes the sequence of the three shots within each of these two groups.

Parris Ward testified that the animation depicts the experts' "best scenario for how [the shots] occurred," but he also acknowledged that he could not tell the jury "specifically [that] that's exactly how they happened." The other expert, Dr. Carley Ward, testified that she analyzed the evidence and formed an opinion that the first four shots were fired in the sequence shown in the animation. She based her opinion on the likely postures of Deputy Hoenig's body as it was hit by each shot. Defendant neither challenges the admissibility of Dr. Ward's opinion testimony nor explains how an animation accurately illustrating admissible

26

opinion testimony can be inadmissibly speculative.  Accordingly, his argument fails.**1**

As to the sequence of the fifth, sixth, and seventh shots, defendant is correct that the sequence depicted in the animation is speculative.  In fact, expert witness Parris Ward acknowledged that these shots were "arbitrarily numbered . . . in that order"; therefore, the jury could not possibly have been misled regarding the sequence of these shots.  Moreover, these last three shots hit nearby vehicles without causing injury to anyone.  The evidence concerning these shots was relevant only to show that defendant continued shooting after Deputy Hoenig was lying on the ground.  Even if the animation incorrectly depicted the sequence of these final shots, defendant suggests no way in which that error could have improperly affected the jury's consideration of the issue of premeditation and deliberation.

### ii. The animation did not create an improper air of scientific certainty

Defendant argues that the animation gave the prosecution's case an unjustified "air of technical and scientific certainty."  (*Dunkle*, *supra*, 139 P.3d at p. 250.)  Defendant relies on out-of-state decisions cautioning that juries find visual evidence, including computer animations, uniquely persuasive.  (See, e.g., *Clark v. Cantrell* (S.C.Ct.App. 1998) 504 S.E.2d 605, 612; *Hinkle v. City of Clarksburg, W. Va.* (4th Cir. 1996) 81 F.3d 416, 424–425 (*Hinkle*).)

---

**1** The sequence of shots depicted in the animation accords with Nada Watson's testimony.  Watson testified that she heard the first shot and then watched defendant fire the second shot while he was standing on the driver's side of the patrol car, near the rear tire.  Finally, she saw defendant fire two more shots from that same spot or near it.

27

This part of defendant's argument does not take issue with the *content* of the animation, but with its *form* as a visual reenactment. That form, defendant argues, was likely to beguile the jurors into uncritically accepting the version of events depicted in the animation. He argues that the animation should have been excluded under Evidence Code section 352 because its probative value was substantially outweighed by the probability that its admission would create a substantial danger of misleading the jury. He asserts that the animation tended to give the evidence " ' "a posture of mystic infallibility in the eyes of a jury." ' " (*Hood*, *supra*, 53 Cal.App.4th at p. 969, quoting *People v. Kelly*, *supra*, 17 Cal.3d at p. 32.)

The trial court did not abuse its discretion in applying Evidence Code section 352. Parris Ward, the court, and the prosecutor all made clear to the jury that the animation did not recreate the shooting precisely. Parris Ward said about the animation: "It doesn't tell you, because it's from [a] computer, that this had to happen this way. It's an illustrative tool for explaining concepts." He also testified that he could not determine "the exact position of the shooter when [the shooter] fired any one of the shots." The court, as already noted, cautioned the jury that the animation was "not a film of what actually occurred or an exact re-creation." In addition, the prosecutor in closing argument admitted: "We do not know the exact position. The video [animation] isn't intended to show the exact positions." The prosecutor later added: "[T]he shots were labeled [in the video animation] arbitrarily, showing the locations from which the defendant fired as indicated by the shell casings. That's why on the video there is a gray area because we can't say exactly where it was that [he] shot . . . ."

Given those statements, we are confident that the jurors understood the animation's limited role, and we therefore see no indication that the trial court abused its discretion in ruling that the probative value of this evidence was not

28

substantially outweighed by a risk of undue prejudice to defendant. (Evid. Code, § 352; see *Hood*, *supra*, 53 Cal.App.4th at p. 972; see also *Serge*, *supra*, 896 A.2d at pp. 1185–1186; *Hinkle*, *supra*, 81 F.3d at p. 425; *Harris v. State*, *supra*, 13 P.3d at pp. 496–497.) The trial court's cautionary instruction (see p. 20, *ante*) is one of several factors that distinguish this case from the decision of the Oklahoma Court of Criminal Appeals in *Dunkle*, *supra*, 139 P.3d 228, on which defendant primarily relies. In *Dunkle*, the court concluded that it was prejudicial error for the trial court to admit four computer animations because the evidence in the case did not adequately support the conclusions reached by the expert and depicted in the animations. (*Id.* at pp. 249–251.) In addition, the trial court in *Dunkle* had failed to give an instruction informing the jury about how it should understand and evaluate the animations. (*Id.* at p. 251.) Here, by contrast, the evidence adequately supported the conclusions of the prosecution's experts, and the trial court appropriately instructed the jury that the animation was not an exact recreation and only showed the prosecution's version of the events.

### *iii. The animation was not inadmissibly cumulative*

Finally, defendant claims that the animation was cumulative because it merely repeated the testimony of the many prosecution witnesses, including the animation's creators, Dr. Carley Ward and Parris Ward. This argument misapprehends the animation's role as demonstrative evidence. The animation was not offered as substantive evidence, but as a tool to aid the jury in understanding the substantive evidence. As demonstrative evidence, it was appropriate for the animation to correspond to the other evidence offered by the prosecution. (See *People v. Williams*, *supra*, 16 Cal.4th at pp. 213–214 [a foam head pierced with knitting needles was admissible demonstrative evidence because it showed bullet trajectories described by expert].)

29

### d. Any error was not prejudicial

Even if the trial court somehow abused its discretion in admitting the animation into evidence, no prejudice could have resulted under any prejudice standard, as discussed below.

Defendant contends that the animation's purely speculative parts (see pp. 24–27, *ante*) unfairly bolstered the prosecution's argument that he acted with premeditation and deliberation, thereby making him guilty of first degree murder. In a related argument, he asserts that the animation unfairly undermined his methamphetamine intoxication defense.

The latter argument fails because defendant did not present an intoxication defense at trial. Moreover, the animation implied nothing about defendant's mental state that was not implied by the physical evidence and expert testimony; rather, it merely illustrated the conclusions that the prosecution's expert witnesses drew from the physical evidence. The animation did not depict the shooter moving, nor was it otherwise suggestive about the shooter's degree of intoxication. In addition, the figures in the animation had indistinct and expressionless facial features, giving no hint of specific thoughts or emotions.

Furthermore, the prosecutor in closing argument did not refer to the animation as proof of defendant's mental state. The prosecutor's argument emphasized the "choices" defendant made throughout the night of the killing, including the choice to load the gun, the choice to carry it, the choice to use foul language in addressing Deputy Hoenig, and the choice to dispose of the gun in a hidden place. Most of the choices that the prosecutor mentioned preceded or followed the shooting, and none was depicted in the animation in a way that implied a mental state.

At the climax of his closing argument, the prosecutor focused on the fatal shot — labeled as "Shot #3" in the animation. After summarizing the evidence

30

indicating that the fatal shot was fired from four to six feet away — and noting that "[t]he video isn't intended to show the exact positions" — the prosecutor demonstrated to the jury how close four to six feet is. The prosecutor argued that the close proximity was "important . . . circumstantial evidence of what was in the defendant's mind," because it meant that defendant was "looking Mike Hoenig, helpless, . . . in the face" when he fired the shot that killed him.

The latter argument related to defendant's mental state, but to support his argument, the prosecutor relied on Dr. Ward's expert testimony, not on the animation. The prosecutor told the jury: "[I]n the video there is a gray area because we can't say exactly where it was that [defendant] shot, but we know as I demonstrated here and [as] *Dr. Ward testified*, he was looking Mike Hoenig right in the eye from four to six feet away when he fired the fatal shot." (Italics added.)

Accordingly, even if the trial court somehow abused its discretion in admitting the animation into evidence, no prejudice could have resulted.

### B. Penalty Phase Issues

#### *1. Instruction on aggravating and mitigating factors*

CALJIC No. 8.85 — a standard jury instruction on statutory aggravating and mitigating circumstances — is according to defendant constitutionally flawed because (1) it does not specify which factors are aggravating and which are mitigating, and (2) subdivision (d) of the instruction, which permits the jury to consider "extreme mental or emotional disturbance," implicitly precludes the jury from considering disturbance that is less than "extreme." Defendant argues that the trial court violated his constitutional rights by giving the instruction here. Defendant forfeited his claims because he did not ask the trial court to modify this standard instruction to accommodate his concerns. (*People v. Carpenter* (1997) 15 Cal.4th 312, 391–392 (*Carpenter*); *People v. Arias* (1996) 13 Cal.4th 92, 171

(*Arias*).)  In any case, we have rejected similar claims in the past and see no reason to reconsider those decisions.  (See, e.g., *People v. Russell* (2010) 50 Cal.4th 1228, 1273 (*Russell*).)

### 2.  *Scope of jury's sentencing discretion*

Defendant argues that CALJIC No. 8.88 — a standard instruction that guides jurors in weighing aggravating and mitigating evidence — has various flaws, and that the trial court violated his rights under the federal Constitution's Sixth, Eighth, and Fourteenth Amendments by giving the instruction here. Defendant forfeited his claims because he did not ask the trial court to modify this standard instruction to accommodate his concerns.  (*Carpenter*, *supra*, 15 Cal.4th at pp. 391–392; *Arias*, *supra*, 13 Cal.4th at p. 171.)  In any case, we have rejected similar claims in the past and see no reason to reconsider those decisions. Specifically, we reject defendant's claims that the instruction given here was constitutionally inadequate because it did not tell the jury (1) that it must choose life without possibility of parole if it finds that mitigating circumstances outweigh aggravating circumstances (*People v. Famalaro* (2011) 52 Cal.4th 1, 43 (*Famalaro*)); (2) that it can choose life without possibility of parole even if the aggravating circumstances outweigh the mitigating ones (*ibid.*); (3) that a defendant bears no burden of proving, and a jury need not unanimously agree on, mitigating factors (*People v. Rogers* (2006) 39 Cal.4th 826, 897; *People v. Panah* (2005) 35 Cal.4th 395, 499); (4) that neither party bears a burden of persuasion as to whether a sentence of death is appropriate (*Famalaro*, *supra*, at p. 43); and (5) that the jury must unanimously agree as to the aggravating circumstances (*id.* at p. 44).

We also reject defendant's argument that CALJIC No. 8.88 as given here wrongly told the jury that it can return a judgment of death if "the aggravating

32

circumstances are *so substantial* in comparison with the mitigating circumstances that it *warrants* death." (Italics added.) This passage is not vague, and it does not fail to give meaningful guidance. (*Russell*, *supra*, 50 Cal.4th at p. 1273.) Defendant also argues that CALJIC No. 8.88 misstates the law by asking the jury to consider if the circumstances "warrant[]" death, rather than asking if they make death the "appropriate" punishment. He asserts that the term "warranted" is broader than the term "appropriate," and that the latter formulation is required by the Eighth Amendment to the federal Constitution. We have rejected the claim in the past and do so again here. (*Russell*, *supra*, at p. 1273.)

We likewise reject defendant's challenges to the law of California governing sentencing in capital cases. We recently rejected similar claims: "The federal Constitution does not impose on the prosecution a burden of proof as to penalty, and the state need not prove beyond a reasonable doubt whether 'aggravating circumstances exist, that the aggravating circumstances outweigh the mitigating circumstances, or that death is the appropriate penalty.' [Citation.] Nor does the federal Constitution require that the jury be unanimous on which aggravating factors apply. [Citation.] Nothing in the high court's decision in *Apprendi v. New Jersey* [(2000)] 530 U.S. 466, or its progeny, compels a different result. [Citation.] [¶] There is no requirement that the trial court instruct the jury that life imprisonment without the possibility of parole is the presumed sentence unless proven otherwise. [Citation.]" (*Famalaro*, *supra*, 52 Cal.4th at p. 44.)

### 3. Lack of instruction defining life without possibility of parole

Citing *Kelly v. South Carolina* (2002) 534 U.S. 246 and *Simmons v. South Carolina* (1994) 512 U.S. 154, defendant argues that the jury instructions at the penalty phase violated his rights under the federal Constitution's Sixth, Eighth, and Fourteenth Amendments because they did not adequately convey to the jury

33

that the term "life without possibility of parole" means that a person given that sentence will never be considered for parole. "[W]e have consistently held that the phrase 'life without possibility of parole' as it appears in CALJIC No. 8.84 adequately informs the jury that a defendant sentenced to life imprisonment without possibility of parole is ineligible for parole. [Citations.] We also have held that . . . *Kelly* [*v. South Carolina*, *supra*,] 534 U.S. 246, . . . and *Simmons* [*v. South Carolina*, *supra*,] 512 U.S. 154, . . . do nothing to alter that conclusion. [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1091.) Defendant identifies no persuasive reason to reconsider our prior holdings.

### C. Cumulative Guilt Phase and Penalty Phase Error

Defendant contends that the trial court's multiple errors, considered together, denied him due process of law and a fair trial. Because, for the reasons discussed above, the trial court did not make multiple errors, defendant's claim of cumulative prejudice necessarily fails.

### D. Challenges to the Death Penalty Law

Defendant contends that California's death penalty law violates both the federal Constitution and international law on various grounds that we have repeatedly rejected in prior cases, and we do so again here:

California's death penalty law does not violate international law. We reach this conclusion taking into consideration defendant's assertions that the International Covenant on Civil and Political Rights binds state courts and that international legal norms are among the evolving standards of decency used to define the scope of the Eighth Amendment to the federal Constitution. (*People v. Foster* (2010) 50 Cal.4th 1301, 1368.) Nor does California's use of the death penalty violate international norms because "this sentence is employed as a regular punishment for a substantial number of crimes." (*Ibid.*) Finally, " 'intercase

34

proportionality review . . . is not required to render California's sentencing scheme constitutional.' [Citations.]" (*Ibid.*)

## DISPOSITION

The judgment is affirmed.

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Duenas

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S077033
**Date Filed:** August 6, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Dewey Lawes Falcone

_____

**Counsel:**

Ronald F. Turner, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ronald F. Turner
321 Hight School Rd. NE, Suite D3 PMB 124
Bainbridge Island, WA  98110
(916) 396-6412

Taylor Nguyen
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 620-6495