*93 LIU, J., Concurring.
I join the court’s opinion except as to the issue of the trial court’s disparate treatment of a small number of prospective jurors whose written questionnaires showed ambiguity concerning their ability to follow the court’s instructions despite their personal views on the death penalty. Although the trial court’s actions did not ultimately result in a skewed jury panel and thus do not constitute reversible error, I write separately to underscore the obligation of trial courts to proceed “ ‘evenhanded[ly]’ ” when exercising their broad discretion to conduct death-qualification voir dire. (People v. Thornton (2007) 41 Cal.4th 391, 425 [61 Cal.Rptr.3d 461, 161 P.3d 3].)
I.
The process of selecting a jury in a capital case is as important as it is difficult, as the record before us illustrates. Jury selection in this case took over seven days; the record from voir dire alone consumed more than 1,000 pages of the approximately 2,500 total pages in the trial court transcript. The majority of that time was spent reviewing the written questionnaires and conducting individual questioning of the 158 members of the jury pool who remained after hardship excusáis. Based on this extensive record, it is clear that the trial court conducted voir dire in a conscientious manner, and today’s opinion rejects defendant’s claims regarding jury selection by undertaking a careful and thorough examination of the record. (Maj. opn., ante, at pp. 24—53.)
I agree with the court that the record does not support defendant’s claim of systematic bias in the trial court’s conduct of voir dire. (Maj. opn., ante, at pp. 39-41.) At the same time, it is apparent that the trial court made more extensive efforts to rehabilitate some jurors who supported the death penalty than it did to rehabilitate at least one juror who opposed the death penalty, even though the written questionnaires of those jurors showed the same degree of ambiguity concerning their ability to set aside their personal views and follow the law. Below I compare the trial court’s treatment of two pro-death-penalty jurors (Y.C. and C.Pa.) with its treatment of one of the anti-death-penalty jurors (B.H.). So that readers can come to their own conclusions regarding the trial court’s treatment of these jurors, I have included at the end of this opinion the responses of each juror to Questions 9 through 32 of the written questionnaire (the questions that ask directly about the death penalty) as well as the transcript of the trial court’s questioning of each juror during voir dire.
Prospective Juror Y.C. The answers given by Y.C. to the written questionnaire were strongly supportive of capital punishment. Y.C. repeatedly answered “yes” to whether she would automatically vote for the death penalty, *94 regardless of the penalty phase evidence, if a defendant was convicted of first degree murder and a special circumstance (Questions 19, 32). She answered “yes” to whether everyone convicted of murder for killing an elderly man with a shotgun during a robbery should receive the death penalty, regardless of the evidence regarding the penalty introduced by the People and the defendant (Question 12). She also said the death penalty should be mandatory for “Murder & murder/special circumstance” (Question 15). Y.C. answered “yes” to whether she believed in the adage “an eye for an eye” (Question 22), and despite the questionnaire’s statement that California law has not adopted the “eye for an eye” principle, she answered “no” to whether she could put that concept out of her mind and apply the principles given by the court (Question 23). In addition, Y.C. answered “no” to whether she could set aside her own personal feelings regarding what the law should be regarding the death penalty and follow the court’s instructions (Question 27) and “Do not know” to whether she could set aside any religious or moral training regarding the death penalty and decide the case according to the law given by the court (Question 25). Y.C. also answered “Do not know” to whether she could accept the court’s representation that life without the possibility of parole means exactly that (Question 28), and she answered “yes” to whether the cost of keeping someone in jail for life and the cost of providing the appellate process would be considerations for her in deciding the penalty (Question 29). On the other hand, Y.C. answered “yes” to whether she would listen openmindedly to any evidence submitted about the penalty and base her decision about the penalty solely on such evidence and instructions (Question 13).
The trial court’s questioning focused on this inconsistency, providing Y.C. with the opportunity to confirm that, despite her strongly held beliefs in favor of the death penalty, she could set aside those personal beliefs and follow the law as instructed by the trial court. The trial court began by instructing Y.C. on the distinction between the guilt phase and penalty phase of a capital trial. The court then explained that in the event of a penalty phase, the jury would hear aggravating and mitigating evidence. When asked whether she could vote for the death penalty if the evidence in aggravation outweighed the evidence in mitigation, Y.C. said, “I believe I could.” When asked whether she could vote for life without the possibility of parole if the factors in mitigation outweighed the factors in aggravation, Y.C. said, “I really don’t[,] I really don’t know at this point, Your Honor” and then said, “I could. Okay. You know. I just.” The court followed up: “THE COURT; You have to hear the evidence? [f] Y.C.; That’s right. I’d have to hear something before I can say. FH] THE COURT; So in other words, you couldn’t make that decision until you’d listen to both sides? [f] Y.C.: That’s right.”
The court proceeded to ask Y.C. about her answers to Questions 22 and 23 of the questionnaire, where Y.C. said she could not set aside the principle of *95 “an eye for an eye” and follow the law: “THE COURT: . . . Based on the answers that you’ve given me to the previous questions do you want to change that answer? [][] Y.C.: Yes. [<JQ THE COURT: Okay. And your answer to that is now yes that you would be able to follow the court’s instructions and base your decision on what you hear in court? [f] Y.C.: Yes, sir. . . .” Further, when asked whether, despite answering “Do not know” to Question 28, she could now accept the court’s representation that life without the possibility of parole means exactly that, Y.C. said, “Yes, sir.” The court then examined Question 29 where Y.C. said the cost of jailing a person for life and providing the appellate process would be considerations for her in deciding the penalty: “THE COURT: Well, are you going to let that influence you in deciding which penalty to decide on? [§] Y.C.: No, I don’t think so. [f] THE COURT: In other words, you’re not going to put dollars and [cents] either way before any other consideration? [f] Y.C.: No, sir. This is important. Not something I take lightly.” Regarding Y.C.’s answer to Question 32 that she would automatically vote for the death penalty regardless of the evidence, the court inquired: “You answered that one ‘Yes,’ and based on your answers to the questions I previously answered would that be no also?” Y.C. replied: “I believe so.” At the end of the voir dire, Y.C. said: “Those questions are rather hicky. [f] ... [][]•■ • Get you thinking one way. [f] ...[][]... Just change everything.”
Prospective Juror C.Pa. Like Y.C.’s answers, the answers C.Pa. gave to the written questionnaire were strongly supportive of the death penalty. C.Pa. indicated that she “[w]ould always impose” the death penalty “regardless of the evidence” (Question 9) and that her view on the death penalty was “Take a life / pay the price” (Question 10). She answered “yes” and “Nonnegotiable” to whether everyone convicted of robbery murder should receive the death penalty, regardless of the evidence (Question 12). C.Pa. also answered “yes” to whether she believed in the adage “an eye for an eye” (Question 22), and she answered “no” to whether she could put that concept out of her mind and apply the principles given by the court (Question 23). In addition, C.Pa. answered “no” to whether she would agree to accept the court’s representation that life without the possibility of parole means exactly that (Question 28), and she answered “yes” to whether, if there was a penalty phase of a trial, she would in every case automatically vote for the death penalty rather than life in prison without the possibility of parole (Question 32). On the other hand, C.Pa. answered “yes” to whether she could set aside her personal feelings regarding what the law should be regarding the death penalty and follow the law as instructed by the court (Question 27).
Noting the inconsistency, the trial court extensively instructed C.Pa. on the applicable law and asked numerous leading questions, including the following: “THE COURT: Okay. Do you understand that if you got to the penalty phase evidence would be introduced in aggravation factors, indicating that the *96 death penalty is appropriate, and mitigation factors, indicating that it is not and that you as a juror would be asked to weigh those factors one against another under the instructions on the law that’s given to you by the court and decide which is the appropriate punishment, [ft] You understand that? [ft] C.Pa.: Yes. [ft] THE COURT: Okay. And you understand that as the law stands in the State of California, the death penalty is not automatic upon conviction of the crime of this nature. It’s simply one of the two available punishments and it’s up to the jury to decide what the appropriate punishment is under the instruction given by the court? [ft] C.Pa.: Yes. [ft] THE COURT: Okay. Understanding that, do you feel that you would be able to follow the court’s instructions and fairly evaluate the evidence in favor of the death penalty and against the death penalty and arrive at a rational decision? [ft] C.Pa.: Yes.” When defense counsel followed up, C.Pa. stated that if she were the defendant, “I would not feel it was fair to put someone with my mind set on the death penalty on this type of jury,” but that “[w]ith the judge’s definitions I would have an open mind.” The trial court denied defendant’s challenge for cause “based on the answers here in court. The juror has assured the court that she can follow the court’s instructions and did not fully understand the original answers given.”
Prospective Juror B.H. Now compare the trial court’s treatment of Y.C. and C.Pa. with its treatment of B.H. On her questionnaire, B.H. indicated she opposed the death penalty but did not check the option indicating “Strongly oppose” or “Will never under any circumstances impose death penalty, regardless of the evidence” (Question 9). B.H. answered “None. ?” to the question asking under what circumstances, if any, she believes the death penalty is appropriate (Question 17). She answered “yes” to whether she would hesitate to vote for first degree murder or for a special circumstance, even if proven beyond a reasonable doubt, just to avoid the task of deciding the penalty, explaining,“I feel against the death penalty” (Question 30). And she answered “yes” to whether she would in every case automatically vote against the death penalty regardless of the evidence, explaining, “Í [am] against the death penalty” (Question 31). On the other hand, like Y.C., B.H. answered “yes” to whether she would listen openmindedly to any evidence submitted about the penalty and base her decision about the penalty solely on such evidence and instructions (Question 13). And like C.Pa., B.H. answered “yes” to whether she could set aside her personal feelings regarding what the law should be regarding the death penalty and follow the law as instructed by the court (Question 27). In short, B.PI.’s questionnaire was no less ambiguous than C.Pa.’s or Y.C.’s.
But the trial court’s voir dire of B.H. was starkly different from its voir dire of Y.C. and C.Pa. In its entirety, the trial court questioned B.H. as follows: “THE COURT: All right. [B.H.], we just have a couple questions for you based on your answers to the questionnaire. And I don’t think we’ll be *97 detaining you too long. Okay? [f] All right. First of all, in answer to Question 9, you indicated that you oppose the death penalty, correct? [f] B.H.: Yes. [f] THE COURT: And then in 10 and 11, you were asked—10 you were asked to explain your views on the death penalty. You left that blank. [f] B.H.: Uh-huh. [f] THE COURT: And can you explain either, A, why you left it blank, or B, what your views are? [f] B.H.: Because I didn’t know what to put down, [f] THE COURT: Okay. So you just weren’t sure what to say? [f] B.H.: Uh-huh. [f] THE COURT: And have your views on death penalty changed over time? [][] B.H.: No. [j[] THE COURT: I’m not clear here on some of your answers exactly what you feel here, [f] Is your feeling about the death penalty such that under no circumstances could you vote to approve it? [f] B.H.: Under no circumstances. THE COURT: None whatsoever? [<J0 B.H.: None whatsoever, [f] THE COURT: Okay. So if—even if this were the most horrible crime in history? [f] B.H.: Even if. [f] THE COURT: And even if the defendant was the worst person in history, you could not—[f] B.H.: I don’t believe in it. [j[] THE COURT: All right. Thank you, ma’am. You’re excused.”
Although there was no difference in the degree of ambiguity in CJPa.’s and Y.C.’s questionnaires on the one hand and B.H.’s questionnaire on the other, there was a clear difference in how the trial court went about resolving the ambiguity. With respect to C.Pa. and Y.C., the trial court from the outset carefully and methodically instructed each juror on the applicable law and asked each juror if she could follow each aspect of the law set forth by the court. By contrast, the trial court did not give B.H. any instruction on the applicable law. After five brief initial questions, the court asked B.H. whether “your feeling about the death penalty [is] such that under no circumstances could you vote to approve it.” The fact that B.H. answered “Under no circumstances” and “None whatsoever” is no more (or less) probative of B. H.’s ability to follow the law than the comparably categorical answers that C. Pa. and Y.C. would have given (and did give on their questionnaires) if the court had simply asked them whether “your feeling about the death penalty is such that you would automatically vote for it in every first degree murder case.” By instructing C.Pa. and Y.C. on the applicable law, the court impressed upon them the important distinction between one’s personal views on the death penalty and the law governing the death penalty. The court did not impress upon B.H. this crucial distinction and did not inquire whether B.H. could set aside her personal views and follow the law, even though B.H. had indicated on her questionnaire that she could do so.
“ ‘[T]rial courts should be evenhanded in their questions to prospective jurors during the “death-qualification” portion of the voir dire, and should inquire into the jurors’ attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors.’ [Citation.]” (People v. Thornton, supra, 41 Cal.4th at p. 425.) Trial courts are *98 afforded broad discretion in conducting voir dire, a process that relies heavily on observing the demeanor of prospective jurors and merits deference from reviewing courts. (See maj. opn., ante, at p. 26; see also People v. Martinez (2009) 47 Cal.4th 399, 445 [97 Cal.Rptr.3d 732, 213 P.3d 77]; Uttecht v. Brown (2007) 551 U.S. 1, 9 [167 L.Ed.2d 1014, 127 S.Ct. 2218].) But there is no reason to think that prospective jurors who oppose the death penalty are any less capable of following the law than prospective jurors who strongly support the death penalty. Precedent makes this clear: “It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State.” (Witherspoon v. Illinois (1968) 391 U.S. 510, 514-515, fn. 7 [20 L.Ed.2d 776, 88 S.Ct. 1770]; see Lockhart v. McCree (1986) 476 U.S. 162, 176 [90 L.Ed.2d 137, 106 S.Ct. 1758] (Lockhart) [“It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.”].)
Separating one’s personal views from one’s fidelity to the law is as familiar as it is essential to our justice system. That is the core duty of every person vested with the privilege and responsibility of serving as a judge, and it is also the most basic obligation of every citizen when he or she is called to civic duty as a juror. Just as we expect individuals who serve as judges to set aside their personal views and faithfully apply the law, the law presumes that citizens who resolutely support or resolutely oppose the death penalty are capable of setting aside their personal views when serving as jurors. (See Lockhart, supra, 476 U.S. at p. 176.) Here, the voir dire of Y.C., C.Pa., and B.H. appeared to proceed on the premise that it is possible, through careful instruction on the law, to rehabilitate jurors who say the death penalty should be “mandatory” for murder or who say they would “automatically” vote for the death penalty in every case, but not possible to rehabilitate a juror who says she would vote for the death penalty “under no circumstances.” By not instructing B.H. on the law or asking whether B.H. could follow the law despite her personal beliefs—while doing exactly that in the case of C.Pa. and Y.C.—the court did not proceed in an evenhanded manner.
It is possible to posit, as today’s opinion does (maj. opn., ante, at p. 39, fn. 15; id. at pp. 47-48), that the trial court observed something in B.H.’s demeanor that suggested it would have been pointless to question B.H. further. I do not disagree that this is adequate to establish that the excusal of B.H. for cause, considered by itself, was not an abuse of discretion. But deference to the trial court’s observation of demeanor is not responsive to the claim that the trial court did not conduct voir dire evenhandedly. In the face *99 of ambiguity in C.Pa.’s questionnaire, the trial court did not begin voir dire by asking C.Pa.: “Is your feeling about the death penalty such that you would always impose the death penalty regardless of the evidence?” And in the face of ambiguity in Y.C.’s questionnaire, the trial court did not begin voir dire by asking Y.C.: “Is your feeling about the death penalty such that you would automatically vote for the death penalty in every first degree murder case?” Had the trial court asked such questions—parallel to those the court asked B. H.—there is no reason to think C.Pa. and Y.C. would have given any different answers than what they indicated in their questionnaires, and on the basis of their answers and demeanor, the trial court might well have concluded that there would be no point in questioning C.Pa. and Y.C. further. But we will never know because the trial court examined the ambiguity in C. Pa.’s and Y.C.’s questionnaires through a markedly different line of questioning than what the trial court used to examine the ambiguity in B.H.’s questionnaire.
Moreover, this differential treatment cannot itself be explained by anything having to do with the jurors’ demeanor because the disparity in questioning occurred at the very beginning of each juror’s voir dire. Although today’s opinion notes that the trial court had the opportunity to assess each juror’s demeanor “both before and during questioning” (maj. opn., ante, at pp. 40, 49, italics added; see id. at p. 39, fn. 15), it is hardly clear what aspects of a juror’s demeanor before questioning would have enabled the court to determine that Y.C. and C.Pa., but not B.H., were potentially receptive to instruction on the law and, in particular, to the obligation to set aside one’s personal views on the death penalty. While our cases have often counseled deference to perceptions of demeanor when a juror gives conflicting or equivocal answers “[d]uring voir dire” (People v. Jones (2012) 54 Cal.4th 1, 41 [140 Cal.Rptr.3d 383, 275 P.3d 496]; see People v. Duenas (2012) 55 Cal.4th 1, 11-12 [144 Cal.Rptr.3d 820, 281 P.3d 887]; People v. Hamilton (2009) 45 Cal.4th 863, 890 [89 Cal.Rptr.3d 286, 200 P.3d 898]; People v. Stewart (2004) 33 Cal.4th 425, 451 [15 Cal.Rptr.3d 656, 93 P.3d 271]), today’s opinion does not (because it cannot) cite any precedent of this court that has placed much reliance, if any, on a trial court’s unstated perceptions of demeanor before questioning. This is not surprising, for such a precedent would tend to erode appellate review in this context almost to the vanishing point.
Thus, the trial court, while generally careful and conscientious in the jury selection process, was not evenhanded in its voir dire of prospective jurors Y.C., C.Pa., and B.H. In those instances, the trial court seemed to proceed on the impermissible assumption that jurors who oppose the death penalty are less capable of fulfilling their civic duty than jurors who support the death penalty.
*100 The trial court’s disparate treatment of those jurors, however, does not warrant reversal of the death judgment because it did not render defendant’s trial “ ‘fundamentally unfair.’ ” (People v. Carter (2005) 36 Cal.4th 1215, 1250 [32 Cal.Rptr.3d 838, 117 P.3d 544].) Defense counsel did not seek an opportunity to question B.H., nor did he object to the court’s excusal of B.H. Although B.H. was not given the same opportunity as C.Pa. and Y.C. to declare her ability to follow the law, it is possible that defense counsel either agreed with the court’s implicit evaluation of B.H.’s demeanor once voir dire began or had some other reason for agreeing to the court’s excusal of B.H. (Or it is possible, though not relevant on direct appeal, that defense counsel should have objected but failed to do so.) Meanwhile, the trial court did not abuse its discretion in denying defense counsel’s for-cause challenges to C.Pa. and Y.C. because both jurors ultimately confirmed that they could set aside their personal beliefs and follow the law as instructed by the court. Moreover, the record as a whole shows that the trial court’s disparate treatment of Y.C., C.Pa., and B.H. did not result in a biased jury. (See maj. opn., ante, at p. 40.)
In sum, the problem here is not with the outcome of the death-qualification process, but rather with the lack of symmetry in the court’s voir dire of pro- and anti-death-penalty jurors whose written questionnaires presented the same degree of ambiguity. Although the discretion of trial courts to conduct death-qualification voir dire is broad, it must be exercised evenhandedly.
II.
Defendant further contends that the trial court improperly used leading questions to rehabilitate pro-death-penalty jurors like Y.C. and C.Pa., whereas it relied on limited, closed-ended questions with anti-death-penalty jurors like B.H. I agree with today’s opinion that the trial court’s use of leading questions fell within its broad discretion. (See maj. opn., ante, at pp. 29, 34-35.) I further find that the disparity between the two modes of questioning did not result in a biased jury. However, I would underscore the court’s “caution against overreliance on leading questions to the exclusion of more open-ended questions.” (Maj. opn., ante, at p. 34, fn. omitted.)
We addressed the subject of leading questions in People v. Mills (2010) 48 Cal.4th 158 [106 Cal.Rptr.3d 153, 226 P.3d 276], which involved an “even-handedness” claim similar to the one raised here: improper rehabilitation of pro-death-penalty jurors in contrast to cursory examination and dismissal of anti-death-penalty jurors. In rejecting the claim, we said: “Nor does the court’s occasional use of leading questions when attempting to rehabilitate ‘death-leaning’ jurors suggest a lack of impartiality. We trust our trial courts understand and appreciate the importance of the voir dire procedure and the *101 need to be ‘evenhanded’ in questioning prospective jurors in a capital case. [Citation.] We assume the trial court formulated its questions based on the individual characteristics of each juror, including the juror’s questionnaire answers and in-court demeanor. To second-guess these choices would encourage the trial court to engage in substantially the same questioning of all prospective jurors irrespective of their individual circumstance, something we have declined to do.” (Id. at p. 190.)
I have explained above why the trial court’s different approaches to questioning C.Pa. and Y.C. on one hand, and B.H. on the other, cannot be explained by the jurors’ questionnaires, in-court demeanor, or any other individual circumstance apparent on the record. In this case, the trial court’s use of leading questions seemed to blur the line between probing a juror’s true views and suggesting there were right and wrong answers to the court’s questions. The entire voir dire of Y.C., for example, contains little in the way of Y.C. expressing her views in her own words. It consists almost entirely of “yes” or “no” answers to lengthy leading questions in which the court recites the law and asks if Y.C. can follow it. The voir dire begins with Y.C. speaking somewhat informally (“Uh-huh.” “Right.” “Okay.” “Um-hmm.”), but as the voir dire proceeds, Y.C. increasingly responds to the court with greater deference (“Yes, sir.” “No, sir.”). In the latter half of the voir dire, she repudiates several answers on her questionnaire, and she concludes by saying: “Those questions are rather tricky. [][]... [f] . . . Get you thinking one way. [1] • ■ • [1] • • • Just change everything.”
By the end of the voir dire, Y.C. appears to be telling the judge what she thinks he wants to hear or what she believes the “correct” answers are. This is hardly surprising. Most people called to jury duty are, and conceive of themselves as, law-abiding citizens. “Given the formality of the setting of a superior court, over which the trial judge presides in a commanding display of authority” (People v. Guerra (2009) 176 Cal.App.4th 933, 943 [98 Cal.Rptr.3d 175]), it is natural for a prospective juror to accord deference to the judge and to answer “yes” when the judge individually instructs the juror on the law and asks “can you follow my instructions?” On one hand, this seems problematic to the extent that Y.C.’s answers, given with increasing deference to the judge, might not reveal her real views. On the other hand, it is possible that the judge, through his leading questions, has succeeded in impressing upon Y.C. the distinction between following one’s personal views and following the law, as well as the duty of jurors to do the latter and not the former. The same can fairly be said of the trial court’s questioning of C.Pa. But if that is the case, then it only underscores the court’s inconsistency in not questioning B.H. in the same manner.
*102 I believe the following guidance offered by a sister high court is well-taken: “We have disapproved close-ended questions that predetermine answers or elicit narrow ‘yes’ and ‘no’ responses. [Citation.] We have encouraged the formulation of additional questions that will provide insight into a juror’s views on the controversy. Obviously, a court must control voir dire examination, but in doing so it must remain neutral. The court must not proselytize; it must not indicate its views of the ‘right’ or ‘wrong’ answers to voir dire questioning. The voir dire should be probing, extensive, fair and balanced.” (State of New Jersey v. Papasavvas (2000) 163 N.J. 565, 585 [751 A.2d 40] (Papasavvas).) In approving the trial court’s conduct of voir dire in State v. Perry (1991) 124 N.J. 128 [590 A.2d 624], the court observed: “There was nothing perfunctory about the process; rather, the trial court’s mixture of open-ended initial questioning and more-particularized follow-up questioning nicely meshed the duty to probe sufficiently with allowing a juror to use his or her own words.” (Id., 590 A.2d at p. 638.)
This is not to say that leading questions have no place in a process that requires prospective jurors to give detailed answers on issues that are not typically part of everyday conversation. But because leading questions tend to be “close-ended questions that predetermine answers or elicit narrow ‘yes’ and ‘no’ responses” (Papasavvas, supra, 163 N.J. at p. 585), and because the authority of the trial judge may cause a juror to give what she thinks is a “correct” answer rather than a considered statement of her true views, trial courts should be careful to avoid overreliance on leading questions to the exclusion of more open-ended questions that allow jurors to state their views in their own words.
Appellant’s petition for a rehearing was denied March 27, 2013.
*103 APPENDIX TO CONCURRING OPINION OF LIU, J.
Y.C.: Juror Questionnaire (Questions 9-32)
The prospective juror’s responses are in italics. Where the prospective juror was asked to select among multiple pre-printed responses, the juror’s selections are indicated by an “X.”
9. Check the entry which best describes your feeling about the death penalty:
_ Would always impose regardless of the evidence
X Strongly support _ Oppose
_ Support _ Strongly oppose
_ Will consider
_ Will never under any circumstances impose death penalty, regardless of the evidence.
10. Please explain your views on the death penalty:
If “you” think another’s life is inconsequential—prepare to pay the ultimate penalty!—if “you” decide to take that person’s life—
11. In what ways, if any, have your views about the death penalty changed over time?

Has always been the same.

12. In this case, the defendant is charged with murder for killing an elderly man with a shotgun. Do you think everyone convicted of such a murder committed during a robbery should receive the death penalty, regardless of the evidence regarding penalty which is introduced by the People and the defendant?
Yes X No _ Please explain:

The murder was probably not necessary

13. If you were selected as a juror in this case and if the jury got to a penalty phase, would you agree to listen open-mindedly to any evidence submitted about the penalty, and base your decision about the penalty solely on such evidence and instructions?
Yes X No Please explain:
*104 14. Do you feel that the death penalty is used too seldom or too often? Please explain:

Too seldom—death row is overcrowded with convicted & sentenced criminals way overdoing the appeal time—too much money spent supporting these folks!

15. Do you feel that the death penalty should be mandatory for any particular type of crime? Please explain:

Yes. Murder & murder/special circumstance.

16. Do you feel that the death penalty should be a possible sentence for any crime other than first degree murder with special circumstances? Please explain:

Yes. Any murder.

17. Under what circumstances, if any, do you believe that the death penalty is appropriate?

See question #15.

18. Under what circumstances, if any, do you believe that the death penalty is inappropriate?

For anything but murder & murder/special circumstance.

19. If a defendant was convicted of first degree murder with a special circumstance, do you feel that you would automatically vote for the death penalty and against life imprisonment without possibility of parole? Please explain:

Yes. See question #14.

20. Do you feel that if a defendant was convicted of first degree murder and a special circumstance, that you would automatically vote against the death penalty and for life without possibility of parole? Please explain:

No.

21. What would you want to know about the defendant before deciding whether to impose the death penalty or life imprisonment without possibility of parole? Please explain:

*105
Why he had such little disregard for another human life.

22. Do you believe in the adage: “An eye for an eye”?
Yes _X_ No _
What does the adage “An eye for an eye” mean to you?

If you sin against another & take their life prepare to lay down your own.

Is your belief in this adage based upon a religious conviction?
Yes JL_ No _
23. California law has not adopted the “eye for an eye” principle. Will you be able to put the “eye for an eye” concept out of your mind and apply the principles the Court gives you?
Yes _ No X
24. Have you had any religious or moral training regarding the death penalty?
Yes X No _ Source:

From family & church

25. Could you set aside any such training and decide this case according to the law which the Court will give to you?
Yes _ No _ Please explain:

Do not know.

26. Do you belong to any organization that either advocates for the death penalty or the abolition of the death penalty?
Yes _ No X
If yes, what organization(s):
*106 27. Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you?
Yes _ No X
Please comment:
28. If you are selected as a juror in this case and if the jury got to a penalty phase, would you agree to accept the court’s representation that life without the possibility of parole means exactly that, that the sentence would be life without the possibility of parole?
Yes _ No _ Please explain:

Do not know.

29. In deciding penalty—that is, life in prison without the possibility of parole or death—would the costs of keeping someone in jail for life be a consideration for you?
Yes X No Please explain:
Would the costs of providing the appellate process be a consideration?
Yes X No Please explain:
30. Knowing that a first degree murder verdict, with a special circumstance found true, could cause the jury to enter a second, “penalty” phase, and cause the jury to have to consider life without the possibility of parole, or death, would you, for any reason, hesitate to vote for first degree murder, or for a special circumstance, if the evidence proved either such thing true, beyond any reasonable doubt, just to avoid the task of deciding the penalty?
Yes ___ No X Please explain:
31. If you found the defendant guilty of first degree murder and found the special circumstance to be true, would you, regardless of the evidence, because of your feelings about the death penalty, in every case automatically vote against the death penalty?
Yes X No Please explain:
*107 32. Are your feelings about the death penalty such, that if there was a penalty phase of a trial, you would in every case automatically vote the death penalty rather than life in prison without the possibility of parole?
Yes X No _ Please explain;
Y.C.: Voir Dire
THE COURT: Okay. Just a couple of questions off your questionnaire here and after we’re through with that you’ll be all done.
Number one, you indicated that in your answer to question number seven you said that you had heard something about this case, general information in the newspaper?
Y.C.: Some small—I don’t believe I even read the whole article.
THE COURT: Okay. And you don’t—as you sit here right now you didn’t form any opinion based on what you read about the guilt or innocence of the defendant in this matter?
Y.C.: No, sir. I didn’t.
THE COURT: And can you promise us that regardless of what you may have read if anything does come back to you at some point that you’ll base your decision on what you hear here in court, not what you read in the Bee?
Y.C.: Yes.
THE COURT: Thank you.
With reference to question 12 you indicated that the defendant was charged with murder of killing an elderly—I’m going to read the question to you.
“In this case the defendant is charged with murder for killing an elderly man with a shotgun. Do you think everyone convicted of such a murder during the commission of the robbery should receive the death penalty regardless of the evidence regarding penalty which is introduced by the People and the defendant?” You answered, “Yes. The murder was probably not necessary.”
Then in the next question 13 it said, “If you were selected as a juror in this case and if the jury got to the penalty phase, would you agree to listen open *108 mindedly to any evidence submitted about the penalty and base your decision solely on such evidence and instructions.” And you also answered yes to that. Okay. So that—
Y.C.: See, I’ve got a confusion about the first part and the penalty part. That’s where I’m getting confused.
THE COURT: That’s why I wanted to explore that with you.
You understand there are two phases possible here in this trial?
Y.C.: Yes.
THE COURT: Okay.
Y.C.: Uh-huh.
THE COURT: And you get the first phase is called the guilt phase?
Y.C.: Okay.
THE COURT: And within the guilt phase evidence would be introduced to show whether the defendant did nor did not commit the crime that he is charged with having committed. And whether the special circumstances alleged in that crime are true or not?
Y.C.: Okay.
THE COURT: And in this case the special circumstances are that the murder was committed during the course of a robbery, right?
Y.C.: Right.
THE COURT: Okay. You understand that so far?
Y.C.: Yes.
THE COURT: Okay. Then if you and the other jurors found beyond a reasonable doubt that the defendant was guilty as charged and the special circumstances were true, you would then move in to what’s called the penalty phase. You understand?
Y.C.: Um-hmm.
*109 THE COURT: And in the penalty phase there would be evidence that would be presented which is called aggravation, which means factors which the prosecution believes would tend to indicate that the death penalty should be imposed, or mitigation, which means factors that the defendant believes would indicate that the death penalty should not be imposed, life without possibility of parole should be the sentence. You understand?
Y.C.: Um-hmm.
THE COURT: Okay. Understanding that would you be able to listen to the evidence and if the evidence in aggravation outweighed the evidence in mitigation, would you be able to vote for the death penalty?
Y.C.: I believe I could.
THE COURT: Yes?
Y.C.: Yes.
THE COURT: And on the other hand, if you listen to the evidence and you believe that the factors in mitigation outweigh the factors in aggravation, could you vote for the sentence of life without possibility of parole?
Y.C.: I really don’t I really don’t know at this point, your Honor.
THE COURT: Well, you—
Y.C.: I could. Okay. You know. I just.
THE COURT: You have to hear the evidence?
Y.C.: That’s right. I’d have to hear something before I can say. -
THE COURT: So in other words, you couldn’t make that decision until you’d listen to both sides?
Y.C.: That’s right.
THE COURT: And determine whether in your mind there were more factors indicating that the death penalty should be imposed than factors indicating that they should not?
Y.C.: Yes.
*110 THE COURT: Or vice versa?
Y.C.: Yes.
THE COURT: Right?
Y.C.: Right.
THE COURT: Okay. And do you have any hesitancy either way in voting either way if you believe that that’s what the evidence indicates?
Y.C.: No.
THE COURT: No?
Y.C.: I do.
THE COURT: Okay. You indicated that in answer to question 22 you believe in the adage an eye for an eye. You said if you yes, you said what does it mean. You said, “If you sin against other and take the life then prepare to lay down your own.” And you said, “Is that based on religious conviction?” You said yes. And then you said, “California law has not adopted an eye for an eye principle.”
“Would you be able to put that concept out of the mind and apply the principle that the court gives you,” and the answer to that said no.
Based on the answers that you’ve given me to the previous questions do you want to change that answer?
Y.C.: Yes.
THE COURT: Okay. And your answer to that is now yes that you would be able to follow the court’s instructions and base your decision on what you hear in court?
Y.C.: Yes, sir. At the time of the day and people in the jury assembly room it was a little hard to concentrate on the questions.
THE COURT: Okay. In a couple of places here you indicated that in deciding, well, actually the question 28 you said, “If selected as a juror in the case and the jury got to the penalty phase would you agree to accept the *111 court’s representation that life without possibility of parole means exactly that that the sentence would be life without the possibility of parole?” And you said “Don’t know.”
Are you willing to accept right now if your concept—if you get in there as a juror that you would—will conduct yourself as if life without possibility of parole means exactly that that the defendant, if he’s sentenced to life without the possibility of parole, will be sentenced to life in prison and will stay there without parole. Are you willing to accept that concept?
Y.C.: Yes, sir.
THE COURT: And are you . . . willing to so conduct yourself in the jury room?
Y.C.: Yes, sir.
THE COURT: Okay. Thank you.
And 29 and 30. You said, “In deciding penalty that it’s life in prison without possibility of parole or death would the cost of keeping someone in jail for life be a consideration?” You said “Yes.”
“And would the cost of providing appellate process be a consideration” and you answered yes.
Did you mean that by that that you would—when you got back there and you were thinking about whether this case if you got to that point deserved the death penalty or life without possibility of parole that you would tend to vote for the death penalty because that way you would save some dollars for the state because the defendant wouldn’t have to be warehoused?
DEFENSE COUNSEL: Well, Your Honor, I’ll object to that because I • think the studies have shown that life without possibilities of parole is in fact cheaper.
THE COURT: Well, that’s not—I’m asking the juror’s concept, not yours, Mr. Spokes.
Y.C.: That was my reasoning behind my answer, yes.
THE COURT: Well, are you going to let that influence you in deciding which penalty to decide on?
*112 Y.C.: No, I don’t think so.
THE COURT: In other words, you’re not going to put dollars and cents either way before any other consideration?
Y.C.: No, sir. This is important. Not something I take lightly.
THE COURT: And on the other hand, with regard to the appellate process if you were to vote for the death penalty would you be swayed to vote the other way because of the cost of an appeal if that is the situation?
Y.C.: No.
THE COURT: No?
Y.C.: No.
THE COURT: Okay.
Then on answer to 31 you said, “If you found the defendant guilty of first-degree murder and found special circumstances to be true, would you regardless of the evidence because of your feelings about the death penalty automatically vote against the death penalty.” And you said yes. Is that a wrong answer?
Y.C.: I believe so.
THE COURT: So your answer to that question is actually no?
Y.C.: Would be a no.
THE COURT: Correct?
Y.C.: Yes, correct.
THE COURT: And with respect to question 22—32 you said, “Are your feelings about the death penalty such that if there was a penalty phase you would in every case vote automatically for the death penalty?” You answered that one “Yes,” and based on your answers to the questions I previously answered would that be no also?
Y.C.: I believe so. Those questions are rather tricky.
THE COURT: Kind of confusing?
*113 Y.C.: Yes. Get you thinking one way.
THE COURT: All right.
Y.C.: Just change everything.
THE COURT: Either side have any questions?
DEFENSE COUNSEL: I have no questions.
PROSECUTOR: No questions, Your Honor.
Pass for cause.
DEFENSE COUNSEL: I’d enter a challenge based on the answers to questions 12, 19, 23, 28, 29 and 32.
THE COURT: Denied.
C.Pa.: Juror Questionnaire (Questions 9-32)
The prospective juror’s responses are in italics. Where the prospective juror was asked to select among multiple pre-printed responses, the juror’s selections are indicated by an “X.”
9. Check the entry which best describes your feeling about the death penalty:
X Would always impose regardless of the evidence
_ Strongly support _ Oppose
_ Support _ Strongly oppose
_ Will consider •
_ Will never under any circumstances impose death penalty, regardless of the evidence.
10. Please explain your views on the death penalty:

Take a life / pay the price

11. In what ways, if any, have your views about the death penalty changed over time?

*114
None

12. In this case, the defendant is charged with murder for killing an elderly man with a shotgun. Do you think everyone convicted of such a murder committed during a robbery should receive the death penalty, regardless of the evidence regarding penalty which is introduced by the People and the defendant?
Yes X No _ Please explain:

Non-negotiable

13. If you were selected as a juror in this case and if the jury got to a penalty phase, would you agree to listen open-mindedly to any evidence submitted about the penalty, and base your decision about the penalty solely on such evidence and instructions?
Yes X No _ Please explain:
14. Do you feel that the death penalty is used too seldom or too often? Please explain:
[C.Pa. circled the words “too seldom” in the printed question.]
15. Do you feel that the death penalty should be mandatory for any particular type of crime? Please explain:

yes, i.e., first degree murder, victim death because of assault—such as heart attack

16. Do you feel that the death penalty should be a possible sentence for any crime other than first degree murder with special circumstances? Please explain:

no, i.e., crime of passion

17. Under what circumstances, if any, do you believe that the death penalty is appropriate?

Willful intent, planned.

18. Under what circumstances; if any, do you believe that the death penalty is inappropriate?

*115
no victim loss of life.

19. If a defendant was convicted of first degree murder with a special circumstance, do you feel that you would automatically vote for the death penalty and against life imprisonment without possibility of parole? Please explain:

the special circumstance wld have to be considered w/in parameter of judicial interpretation

20. Do you feel that if a defendant was convicted of first degree murder and a .special circumstance, that you would automatically vote against the death penalty and for life without possibility of parole? Please explain:

unknown w/o all info.

21. What would you want to know about the defendant before deciding whether to impose the death penalty or life imprisonment without possibility of parole? Please explain:

I wld hope to be considering crime only, & not unfortunate childhood, etc.

22. Do you believe in the adage: “An eye for an eye”?
Yes X No
What does the adage “An eye for an eye” mean to you?

Take a life, give your own.

Is your belief in this adage based upon a religious conviction?
Yes _ No X
23. California law has not adopted the “eye for an eye” principle. Will you be able to put the “eye for an eye” concept out of your mind and apply the principles the Court gives you?
Yes _ No X
24. Have you had any religious or moral training regarding the death penalty?
*116 Yes _ No X Source:
25. Could you set aside any such training and decide this case according to the law which the Court will give to you?
Yes _ No _ Please explain:

N/A

26. Do you belong to any organization that either advocates for the death penalty or the abolition of the death penalty?
Yes _ No X
If yes, what organization(s):
27. Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you?
Yes X No _
Please comment:
28. If you are selected as a juror in this case and if the jury got to a penalty phase, would you agree to accept the court’s representation that life without the possibility of parole means exactly that, that the sentence would be life without the possibility of parole?
Yes _ No X Please explain:
29. In deciding penalty—that is, life in prison without the possibility of parole or death—would the costs of keeping someone in jail for life be a consideration for you?
Yes X No _ Please explain:
Would the costs of providing the appellate process be a consideration?
Yes _ No X Please explain:
30. Knowing that a first degree murder verdict, with a special circumstance found true, could cause the jury to enter a second, “penalty” phase, and cause the jury to have to consider life without the possibility of parole, or death, *117 would you, for any reason, hesitate to vote for first degree murder, or for a special circumstance, if the evidence proved either such thing true, beyond any reasonable doubt, just to avoid the task of deciding the penalty?
Yes _ No X Please explain:
31. If you found the defendant guilty of first degree murder and found the special circumstance to be true, would you, regardless of the evidence, because of your feelings about the death penalty, in every case automatically vote against the death penalty?
Yes _ No X Please explain:
32. Are your feelings about the death penalty such, that if there was a penalty phase of a trial, you would in every case automatically vote for the death penalty rather than life in prison without the possibility of parole?
Yes X No _ Please explain:
C.Pa.: Voir Dire
THE COURT: Good morning, [C.Pa.]. How are you?
C.Pa.: Thank you. Fine.
THE COURT: Just a couple of questions here based on your questionnaire.
In answer to question 9 you said, which was check the entry which best describes your feelings about the death penalty: “Should—would always impose regardless of the evidence.”
Okay. And then in answer to question 27 you said, “Could you set aside your personal feeling regarding the death penalty what you think the law should be regarding the death penalty, follow the law as the court instruct you” and you said yes.
So I need to talk with you about this.
C.Pa.: Okay.
THE COURT: A little bit.
As the law stands in California at the present time in order to have the death penalty be available as a punishment a couple things have to happen. *118 First of all, it has to be a first-degree murder committed and second, it has to be committed under what’s called special circumstances.
Special circumstances are a number of things. It could be during the killing of a law enforcement officer, it could be during a robbery, it could be during a rape, it could be during a kidnapping or laundry list of types of crimes that could cause the death penalty to be available.
You understand that?
C.Pa.; (Nods head.)
THE COURT: You need to answer out loud if you would.
C.Pa.: Yes.
THE COURT: Okay. Thanks.
A couple of phases to a death penalty case. One is the guilt phase where the evidence would be presented to show whether the defendant did or did not commit the crime that he is charged with.
Whether the circumstances are true or not, special circumstances that is, that it was during a robbery in this case.
You understand that?
C.Pa.: Yes.
THE COURT: You understand that only if you found the defendant guilty and the special circumstances to be true would you move to the penalty phase where you would have to decide between the death penalty and life without possibility of parole.
You understand that?
C.Pa.: Yes.
THE COURT: Okay. Do you understand that if you got to the penalty phase evidence would be introduced in aggravation, factors indicating that the death penalty is appropriate, and mitigation factors, indicating that it is not and that you as a juror would be asked to weigh those factors one against another under the instructions on the law that’s given to you by the court and decide which is the appropriate punishment.
*119 You understand that?
C.Pa.: Yes.
THE COURT: Okay. And you understand that as the law stands in the State of California, the death penalty is not automatic upon conviction of the crime of this nature. It’s simply one of the two available punishments and it’s up to the jury to decide what the appropriate punishment is under the instruction given by the court?
C.Pa.: Yes.
THE COURT: Okay. Understanding that, do you feel that you would be able to follow the court’s instructions and fairly evaluate the evidence in favor of the death penalty and against the death penalty and arrive at a rational decision?
C.Pa.: Yes.
THE COURT: Okay. So in your mind then the answer that you checked initially, that you would always impose the death penalty regardless of the evidence, is not your answer as you sit there right now.
C.Pa.: Your Honor, I did not have a definition of murder one with special circumstances when I was filling that out.
THE COURT: Okay. So you didn’t understand?
C.Pa.: No. I understand it now.
THE COURT: And understanding the situation now?
C.Pa.: Yes.
THE COURT: There’s no hesitation in your mind about your ability to be fair and impartial in deciding the correct penalty; is that correct?
C.Pa.: Right.
THE COURT: And if in your mind the circumstances in mitigation, that is, those things which favor life without possibility of parole, weighed more heavily in your mind than those indicating the death penalty should be imposed, would you have any hesitation voting for life without possibility of parole?
*120 C.Pa.: No hesitation.
THE COURT: On the other hand, if you felt that the factors in aggravation, that is, those things indicating that life or that the death penalty was appropriate, outweighed those indicating that life without possibility of parole is more appropriate, would you have any hesitancy in voting that way?
C.Pa.: No, sir.
THE COURT: Okay.
There was some questions about an eye for an eye—.
C.Pa.: Um-hmm.
THE COURT:—in there and you were asked whether you believed in that adage?
A. Yes, I do.
THE COURT: An eye for an eye?
And then there’s another question in there. You understand that the law, as I have explained it to you, does not go along with the eye for an eye concept. That is, it is not automatic?
C.Pa.: Yes.
THE COURT: If a person kills somebody that they are automatically put to death. Do you understand that?
C.Pa.: Yes, sir.
THE COURT: Okay. Understanding that, can you put the eye for an eye concept out of your mind and follow the law as I explain it to you?
C.Pa.: Yes.
THE COURT: All right. In answer to question 28, “If you’re selected as a juror in the case and if the jury got to a penalty phase would you agree to accept the court’s representation that life without the possibility of parole means exactly that that the sentence would be life without the possibility of parole?” You indicated no.
As far as we know since the—since the punishment of life without possibility of parole has been instituted or re-instituted, I guess in the seventies, no one that’s been sentenced to that has ever been paroled, or the fact there is no mechanism, there is no parole boards, there is no group that can grant parole of such a person.
*121 Do you understand that?
C.Pa.: Yes.
THE COURT: As I explain it to you now.
If I explain it to that you that way are you willing to accept that life without possibility of parole means that and not have you be influenced by what might happen later on down the road?
C.Pa.: Yes.
THE COURT: Okay.
All right. I don’t think I have any further questions.
***
THE COURT: Challenge is denied based on the answers here in court. The juror has assured the court that she can follow the court’s instructions and did not fully understand the original answers given.
B.H.: Juror Questionnaire (Questions 9-32)
The prospective juror’s responses are in italics. Where the prospective juror was asked to select among multiple pre-printed responses, the juror’s selections are indicated by an “X.”
9. Check the entry which best describes your feeling about the death penalty:
Would always impose regardless of the evidence
Strongly support _X_ Oppose
Support _ Strongly oppose
Will consider
Will never under any circumstances impose death penalty, regardless of the evidence.
*122 10. Please explain your views on the death penalty:
[blank]
11. In what ways, if any, have your views about the death penalty changed over time?
[blank]
12. In this case, the defendant is charged with murder for killing an elderly man with a shotgun. Do you think everyone convicted of such a murder committed during a robbery should receive the death penalty, regardless of the evidence regarding penalty which is introduced by the People and the defendant?
Yes _ No X Please explain:
13. If you were selected as a juror in this case and if the jury got to a penalty phase, would you agree to listen open-mindedly to any evidence submitted about the penalty, and base your decision about the penalty solely on such evidence and instructions?
Yes X No _ Please explain:
14. Do you feel that the death penalty is used too seldom or too often? Please explain:

I don’t hear it being used to often.

15. Do you feel that the death penalty should be mandatory for any particular type of crime? Please explain:

No. ?

16. Do you feel that the death penalty should be a possible sentence for any crime other than first degree murder with special circumstances? Please explain:

No. ?

17. Under what circumstances, if any, do you believe that the death penalty is appropriate?

None. ?

*123 18. Under what circumstances, if any, do you believe that the death penalty is inappropriate?

Under no circumstances

19. If a defendant was convicted of first degree murder with a special circumstance, do you feel that you would automatically vote for the death penalty and against life imprisonment without possibility of parole? Please explain:

No.

20. Do you feel that if a defendant was convicted of first degree murder and a special circumstance, that you would automatically vote against the death penalty and for life without possibility of parole? Please explain:

No. ?

21. What would you want to know about the defendant before deciding whether to impose the death penalty or life imprisonment without possibility of parole? Please explain:

Nothing

22. Do you believe in the adage: “An eye for an eye”?
Yes _ No X
What does the adage “An eye for an eye” mean to you?

Nothing ?

Is your belief in this adage based upon a religious conviction?
Yes _ No X
23. California law has not adopted the “eye for an eye” principle. Will you be able to put the “eye for an eye” concept out of your mind and apply the principles the Court gives you?
Yes X No
*124 24. Have you had any religious or moral training regarding the death penalty? Source:
Yes No X
25. Could you set aside any such training and decide this case according to the law which the Court will give to you?
Yes X No _ Please explain:
26. Do you belong to any organization that either advocates for the death penalty or the abolition of the death penalty?
Yes No X
If yes, what organization(s):
27. Could you set aside your own personal feelings regarding what you think the law should be regarding, the death penalty, and follow the law as the Court instructs you?
Yes X No _
Please comment:
28. If you are selected as a juror in this case and if the jury got to a penalty phase, would you agree to accept the court’s representation that life without the possibility of parole means exactly that, that the sentence would be life without the possibility of parole?
Yes X No _ Please explain:
29. In deciding penalty—that is, life in prison without the possibility of parole or death—would the costs of keeping someone in jail for life be a consideration for you?
Yes X No _ Please explain:

1 feel it would be better then the death penalty

*125 Would the costs of providing the appellate process be a consideration?
Yes _ No _ Please explain:

?

30. Knowing that a first degree murder verdict, with a special circumstance found true, could cause the jury to enter a second, “penalty” phase, and cause the jury to have to consider life without the possibility of parole, or death, would you, for any reason, hesitate to vote for first degree murder, or for a special circumstance, if the evidence proved either such thing true, beyond any reasonable doubt, just to avoid the task of deciding the penalty?
Yes X No _ Please explain:

I feel against the death penalty

31. If you found the defendant guilty of first degree murder and found the special circumstance to be true, would you, regardless of the evidence, because of your feelings about the death penalty, in every case automatically vote against the death penalty?
Yes X No _ Please explain:

I against the death penalty

32. Are your feelings about the death penalty such, that if there was a penalty phase of a trial, you would in every case automatically vote for the death penalty rather than life in prison without the possibility of parole?
Yes _ No X Please explain:
B.H.: Voir Dire
THE COURT: Right there in the front row, ma’am, about third chair in, or fourth, wherever.
B.H.: Right here?
THE COURT: Okay. Very good.
All right. [B.H.], we just have a couple questions for you based on your answers to the questionnaire. And I don’t think we’ll be detaining you too long. Okay?
*126 All right. First' of all, in answer to Question 9, you indicated that you oppose the death penalty, correct?
B.H.: Yes.
THE COURT: And then in 10 and 11, you were asked—10 you were asked to explain your views on the death penalty. You left that blank.
B.H.: Uh-huh.
THE COURT: And can you explain either, A, why you left it blank, or, B, what your views are?
B.H.: Because I didn’t know what to put down.
THE COURT: Okay. So you just weren’t sure what to say?
B.H.: Uh-huh.
THE COURT: And have your views on death penalty changed over time?
B.H.: No.
THE COURT: I’m not clear here on some of your answers exactly what you feel here.
Is your feeling about the death penalty such that under no circumstances could you vote to approve it?
B.H.: Under no circumstances.
THE COURT: None whatsoever?
B.H.: None whatsoever.
THE COURT: Okay. So if—even if this were the most horrible crime in history?
B.H.: Even if.
*127 THE COURT: And even if the defendant was the worst person in history, you could not—
B.H.: I don’t believe in it.
THE COURT: All right. Thank you, ma’am. You’re excused.