Filed 2/27/15  P. v. Rios CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT DANIEL RIOS,<br><br>    Defendant and Appellant. | H039311<br>(Santa Clara County<br>Super. Ct. No. CC810614) |

Defendant Robert Daniel Rios was convicted by a jury of multiple counts of rape and oral copulation involving two women.  He contends that the trial court erred by failing to excuse a juror for cause and by denying his motion for a mistrial.  Finding no error, we will affirm the judgment.

## I.  TRIAL COURT PROCEEDINGS

Defendant was charged by information with five counts of oral copulation by force (Pen. Code, § 288a, subd. (c)(2); counts 1, 2, 4, 6, and 8) and three counts of rape (§ 261, subd. (a)(2); counts 3, 5, and 7).  Counts 4 through 8, involving victim S.O., were alleged to have occurred within days after the other counts involving victim B.B.  All counts alleged multiple victim enhancements (§ 667.61, subd. (b)), and counts 4 through 8 alleged that defendant kidnapped S.O. (§ 667.61, subds. (a), (b), (e)).

The prosecution called as witnesses both victims, the sexual assault nurse who examined S.O., two friends who were with S.O. before she encountered defendant, and a

woman who previously had been sexually assaulted by defendant. Defendant called experts in sexual assault examinations and methamphetamine use, the manager of a motel patronized by defendant and B.B., and a lay witness to impeach S.O. based on fabricated allegations of previous sexual abuse.

A.    THE PROSECUTION'S CASE

    1.    Offenses Involving B.B.

Although she had abstained from using methamphetamine for a few weeks before defendant's October 2011 trial, 24-year-old B.B. had been a methamphetamine addict for several years and was regularly using methamphetamine in 2008. About 2:00 a.m. on June 15, 2008, after smoking methamphetamine for over 24 hours, B.B. drove with $50 to buy more methamphetamine. Thinking that defendant was her contact, she jumped into his car and gave him the $50 to buy drugs. Even though she had never met defendant, who was 31 years old, B.B. readily accepted his offer to smoke methamphetamine, leaving her phone behind in her car with the keys in the ignition. Defendant drove to a side street where he lay down on the back seat and smoked methamphetamine with B.B., who was reclined in the passenger seat. B.B. was bi-polar and not taking her medication.

Defendant started to masturbate, grabbed B.B.'s hand, and placed it on his penis. B.B. pulled back, said she did not want to do that, and asked defendant to take her back to her car. He then forced oral copulation for hours until he ejaculated in her mouth. B.B.'s arm was in a cast from an injury two weeks earlier. She could not defend herself and feared for her safety. Defendant told her that he had a gun, could harm her family, and dispose of her body. B.B. begged defendant to stop, and she cried the entire time. The sun was up when they left the side street.

Defendant drove B.B. back to her car, but it was gone, so B.B. decided to stay with defendant while she figured out what to do. After making a short stop where she stayed in the car with her eyes closed, B.B. drove with defendant to a motel in Santa

2

Clara. She waited in the car while defendant checked in, noticing cars and people in the area. Defendant retrieved a bag from his truck which B.B. later learned contained a portable DVD player and pornographic DVDs, and they went to the room.

Defendant directed B.B. to wash his clothes while he took a bath. B.B. was scared because she did not have a car or a phone and she was afraid of violence. Defendant and B.B. smoked methamphetamine, and defendant watched pornography DVDs and forced oral copulation and sexual intercourse for several hours. At some point defendant had a visitor, defendant left the room for 30 minutes or an hour, B.B. called her grandfather to wish him a happy Father's Day, and she and defendant both slept. B.B. did not leave the motel room. She denied having sex with defendant in exchange for drugs. After checking out of the motel at noon the next day, defendant drove B.B. home.

B.B. did not call the police because she was scared. She went to the hospital because she was suicidal, and she told hospital staff that she had been raped.

### 2. Offenses Involving S.O.

About 8 p.m. on June 18, 2008, 15-year-old S.O. was walking home from her friend's house. She was walking when defendant drove up to her and asked her if he could use her phone. Obliging, she handed him the phone through the passenger window and he used it. Defendant urged her to get into his car, gesturing to a car seat in the back, telling her he had a son and it was safe. Even though she was scared, she got in to retrieve her phone. S.O. asked defendant to drive her home, but he drove instead to buy methamphetamine. S.O. had never smoked methamphetamine, she did not want to smoke with defendant, and she repeatedly asked to be taken home. Defendant drove to a residential area where they encountered a security guard, then he drove to another neighborhood and parked across the street from houses. Defendant insisted that S.O. smoke with him, saying things like "I'm being nice to you right now," and "Girl, you don't know me."

3

As he had with B.B., defendant told S.O. to touch his penis after they smoked methamphetamine. When she did not agree, he grabbed her hand and put it on his penis. Next he grabbed her head and forced oral copulation. When she tried to stop, he slapped her head and said "I'm being nice right now." He also grabbed her hair, threatened to punch her, and warned: "You'd better do it if you want to go home." They moved to the back seat where defendant alternated between forcible intercourse and forcible oral copulation seven or eight times. S.O. asked defendant to stop, but she was scared and did not physically resist him.

During the last act of oral copulation, defendant put a piece of clothing over S.O.'s head and threatened: "I'm going to kill you. You're not going home tonight." Those words caused S.O. to fear for her life and precipitated her escape. She pulled away ostensibly to put her hair up, unlocked the car door, and ran to the house across the street, where the residents called the police.

S.O. was transported to the hospital and underwent a sexual assault examination. She reported several areas of pain, and she stated that she had been coerced into smoking methamphetamine. The examining nurse testified that S.O.'s injuries were consistent with sexual assault. The nurse collected samples of suspected semen, and the parties stipulated to a criminalist's testimony that defendant was the major source of DNA detected on S.O's underwear.

### 3. Defendant's Past Conduct

Tyler Doe testified that she dated defendant around 2006. On one occasion in 2005 or 2006 when defendant was on methamphetamine, he tied Doe's legs with a seatbelt when they were in her car. Defendant positioned Doe's legs up near her shoulders and kept her tied in that position for five to six hours during sexual intercourse. Doe initially consented to the sex but she did not consent for the entire duration. When Doe asked defendant to stop, he hit her and threatened her life and her mother's life.

4

The court had granted defendant's motion in limine to exclude any evidence of defendant's recent release from prison or status as a parolee. Despite being advised by the prosecutor not to volunteer extra information, Tyler Doe volunteered during cross-examination that defendant was on parole when they were dating. When asked whether she had ever consumed alcohol with defendant, Doe responded, "No, not really. [¶]…[¶] We didn't go out. He was always on parole, so he was always at his house."

B.   **DEFENDANT'S CASE**

Defendant's cross-examination of both victims focused on the multiple opportunities each had to summon help or walk away, suggesting that their sexual contact with defendant was consensual. The motel manager testified to B.B. visiting the motel's common areas, searching vending machines for change and ashtrays for cigarette butts.

In an effort to impeach S.O. with a prior false allegation of sexual abuse prompted by S.O.'s fear of repercussions from her parents, a housemate of S.O.'s friend Julio testified that he never tried to sexually touch S.O. or her friend or offer either girl money to sexually touch him when they were visiting with Julio in his home in April 2008. (S.O. testified on redirect examination that the witness touched her on the inner thigh and her leg several times when she was trying to sleep at his house. She described that he tried to kiss her and offered her money to kiss and touch him, and he tried to touch her friend in the same way. After leaving the home with her friend and Julio in the witness's Jeep, the three were in an automobile accident. S.O. was transported to the hospital where she reported that the housemate had tried to touch her inappropriately and offered her money to touch him. She testified she told hospital staff about her encounter with the housemate witness not out of fear of getting in trouble about the accident but to explain why they left the witness's home in the Jeep.)

A sexual assault examination expert testified that the physical findings from S.O.'s examination were consistent with both sexual assault and consensual sex. An expert in methamphetamine use testified that it is common for methamphetamine addicts to trade

5

sex for drugs, and that methamphetamine greatly increases desire and capacity for sexual activity. He explained that methamphetamine can destabilize the mood of a person with bi-polar disorder and that it is common for addicts to do things they would not ordinarily do to obtain methamphetamine. He also testified that a methamphetamine user's sex drive can become that person's sole focus to the point of forcing sex and not hearing pleas to stop.

## C.    THE VERDICTS

Defendant was found guilty of one count of forced oral copulation involving B.B. (count 1), but the jury could not reach unanimous verdicts regarding the other B.B. charges, resulting in mistrials on counts 2 and 3. The jury returned guilty verdicts on all counts involving S.O., but they were unable to reach a unanimous decision regarding the kidnapping allegations related to those charges. With each forced oral copulation guilty verdict (counts 1, 4, 6 and 8), the jury returned true findings of multiple victims.

## D.    POST-TRIAL PROCEEDINGS

Defendant moved for a new trial, arguing (1) that the court wrongfully denied his challenge to a juror for cause, and (2) that the court's admonition to the jury regarding Doe's testimony was insufficient to cure her improper reference to defendant's parole status. The motion was denied, and defendant was sentenced to 15 years to life on counts 1, 4, 6, and 8, and eight years on counts 5 and 7, for a total term of 76 years to life. Counts 2 and 3 were dismissed.

## II.  DISCUSSION

## A.    DEFENDANT'S CAUSE CHALLENGE TO JUROR NO. 12

More than 90 prospective jurors participated in voir dire over a four-day period. After several jurors were excused for cause, and each side exercised their 20 allotted peremptory challenges, a jury was sworn and voir dire for three alternate jurors began. After exhausting his three allotted peremptory challenges against prospective alternate jurors, defendant sought to excuse a prospective alternate juror for bias. That request was

6

denied, the challenged prospective juror was selected as the second alternate juror, and, due to the excusal of two seated jurors during trial, that alternate juror was substituted in as Juror No. 12 and deliberated the case.

## 1. Legal Framework

A challenge to a prospective juror for cause may be based on implied or actual bias. (Code Civ. Proc., § 225, subd. (b)(1)(C).) Actual bias is defined as "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (*Ibid.*) The trial court exercises wide discretion in jury voir dire proceedings (*People v. Horning* (2004) 34 Cal.4th 871, 896), and is entitled to resolve conflicting evidence based on its observation of the prospective juror's demeanor. (*People v. Lewis* (2008) 43 Cal.4th 415, 489.)

Juror bias is a factual determination we review for substantial evidence. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1262.) When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on the reviewing court if they are supported by substantial evidence. (*People v. Duenas* (2012) 55 Cal.4th 1, 17.) Deference to the trial court is appropriate in this context because the trial judge is in the unique position to observe and assess the demeanor of the jury venire. (*Ibid.*)

## 2. Voir Dire

Juror No. 12, a systems software architect, lived with his wife in San Jose. He had served as a juror on two civil cases, and he understood the higher burden of proof required in criminal cases.

The court inquired whether any family members had been sexual assault victims. Juror No. 12 responded that when he was 14 he caught his 16-year-old cousin molesting his 12-year-old sister on a family vacation, and he was angry for a long time because the

7

assault was handled inside the family and he wanted more to be done about it. He had not thought about the matter for a long time, and the jury selection process had spurred painful memories. The court inquired whether Juror No. 12 could evaluate the testimony dispassionately and make a decision based solely on the evidence admitted at trial. Juror No. 12 responded: "I will make my best effort to do so." The court asked whether Juror No. 12's feelings would prevent him from listening to the testimony, to which he answered: "[A]s I said, I haven't thought about it for a long time. It is -- it does bring up emotions. I think I can still remain objective. I'll try. It's been a while. You know, I -- I can't speak as to, you know, depending on the subject matter of the trial, if we get -- there are certain things that may key off memories, but as I said, I tried. It's been a while. It's been a long time trying to deal with it. I think I can keep it objective."

Juror No. 12 also shared that he had physically intervened in a rape situation at a party in Australia when he was 24 years old. The perpetrator was prosecuted but not convicted because of insufficient evidence. Although Juror No. 12 was disappointed, he understood that there were problems with the chain of evidence affecting reasonable doubt.

Voir dire of prospective alternate jurors continued the next day when Juror No. 12 voiced that he has a "strong opinion" about sexual violence toward women. Defense counsel asked Juror No. 12 whether he was concerned that, despite his best efforts, he would be unfair if he sat on the jury. Juror No.12 explained: "Sure. I have concerns. Some of it depends on the content, on the events. Sure. You know, I didn't sleep very well last night because it was bringing back memories that I buried a long time ago, so I've -- like I said, you know, it was a long time ago. I think I've -- I will -- I will do my best to be objective in the case. As I said, it's a very emotional time for me. I think I can be objective, but it was -- you know, I still have scars from that."

The colloquy continued: "[Counsel]: Those scars, as you phrased them, I guess what I'm concerned about is, if something in this case triggers more directly those

8

memories and the emotions that's associated with them, is that going to prevent you from being -- despite your best efforts and intentions. It's certainly clear that that's what you'd like to achieve, but I've got to honestly ask you, I mean, do you think that you may not be able to get there if something happens? Because I can't guarantee you what the testimony will be. [¶] [Juror No. 12]: It is possible. I may -- we may hit something that really sort of -- if it brings back a memory, it's possible. I spent a long time getting over this. [¶] [Counsel]: If it does bring back that visceral memory, at that point you're not going to be able to do it, not going to be able to be fair? [¶] [Juror No. 12]: Like I said, I think if it was an extreme -- if it was an extreme association, I might have trouble being fair."

During the prosecutor's later voir dire, Juror No. 12 said the more recent incident had occurred 16 or 17 years ago and neither incident had affected him in the past 10 years. He said he did not think hearing the facts of the case would make him depressed or nonfunctional, although he was not entirely neutral about violence toward women. Responding to the prosecutor's question whether he could put aside his personal feelings, listen to the facts, and render a judgment based only on the facts, Juror No. 12 answered: "I believe I can, and I don't know what the content -- so there may be things that would trigger memories that would maybe sway my opinion towards, you know, towards being more protective of the woman's interests." The exchange continued: "[Prosecutor]: [D]o you accept the concept [defendant] is innocent until proven guilty? [¶] [Juror No. 12]: Yes, I do. [¶] [Prosecutor]: Do you accept you cannot find him guilty until you hear evidence of his guilt? [¶] [Juror No. 12]: Yes. [Prosecutor]: And do you agree to follow the law the judge gives you and not reach a conclusion until you've heard all of the evidence? [¶] [Juror No. 12]: Yes."

The court denied defendant's request to excuse Juror No. 12 for cause. The court recognized that the question was close, but based on Juror No. 12's answers to the

9

prosecutor's final questions, it concluded that Juror No. 12 could put his experiences aside and follow the court's instructions.

### 3. New Trial Motion

In denying defendant's new trial motion based on the failure to excuse Juror No. 12 for cause, the court explained: "I don't think -- at least in my experience -- that when a question or an issue was raised by a juror in response to our request to be honest, that alerting us to a possible issue automatically excludes that person from serving as a juror. He or she is merely alerting Court that there might be something that warrants further inquiry … . [¶] Now, in addition to the answers that he provided to the Court and counsel, the Court … watched that juror as he provided the answers because we all know that sometimes body language belies what is being stated. [¶] … [¶] In addition to the juror's unequivocal responses to [the prosecutor's] questions … Can they leave their experiences out of analysis when assessing the testimony and also the decision-making process? [¶] And this particular juror assured us that he could, and the Court saw nothing, observed nothing, in either his tone or his body language, that gave me some cause for concern; otherwise, the Court would have, as we did so many instances during course of this trial, excuse that person for cause."

### 4. Analysis

Defendant argues that substantial evidence does not support the trial court's finding as to Juror No. 12 because he consistently qualified his answers with warnings that the evidence might be sufficiently disturbing to cause him to lose his neutrality. But Juror No. 12 also repeatedly expressed the view that he thought he could be impartial. He had several opportunities to tell the court he could not be fair but, even after observing nearly four days of voir dire, including candid dialogue resulting in several excusals for cause, he never claimed a biased state of mind. When pressed, he acknowledged that he *might* have trouble being fair, but only if there was "an extreme association." Having been apprised of the anticipated testimony as detailed in the

10

People's trial brief, the court was in a position to assess the likely impact of Juror No. 12's experiences in that light and to conclude that they did not involve such similar circumstances as to be of concern. His strong disapproval of violence against women is not an uncommon view and, in and of itself, did not make him biased. Notwithstanding his views, he stated he understood the burden of proof, and he promised to follow the law and not reach a conclusion without hearing all the evidence. The court found his answers credible.

Defendant's reliance on *People v. Bittaker* (1989) 48 Cal.3d 1046 is unavailing. In that case the trial court was found to have erred in denying a challenge for cause where the prosecutor was unsuccessful at rehabilitating a juror who responded unequivocally that she could not be fair and impartial and declared that she would be unable to listen to the evidence. (*Id*. at pp. 1089-1090.) Here, despite ample opportunity, Juror No. 12 never made an unqualified statement that he could not be impartial, and he expressed no difficulty with his ability to listen to the evidence. We conclude substantial evidence in the record supports the trial court's decision regarding the cause challenge to Juror No. 12.

## B. DEFENDANT'S MISTRIAL MOTION

Immediately after Tyler Doe testified that defendant "was always on parole," outside the jury's presence defendant moved for a mistrial, claiming the violation of the court's in limine ruling to be prejudicial and incurable. Defendant argued that, because the case involved sexual offenses and Doe was testifying under Evidence Code section 1108 to a prior sexual offense, the jury would infer that defendant was on parole for similar conduct. Defendant also pointed out, and the prosecutor agreed, that Doe's statement was inaccurate because Doe testified to a relationship with defendant in 2005 and 2006, and defendant was not on parole at that time. The court denied the motion and admonished the jury: "[N]ear the end of Ms. Doe's testimony, before we took a break, there was some mention of parole. I'm striking that from the record, and you are not to

11

consider that during your deliberations. In fact, there is a stipulation between counsel, so you can take this into consideration, that, in fact, [defendant] was not on parole."

We review the trial court's denial of a motion for a mistrial for an abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 573.) A mistrial is warranted " 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if [the court] is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]." (*Ibid.*) The trial court is vested with considerable discretion to assess incurable prejudice because, by its nature, that inquiry is speculative. (*Ibid.*) Here, not only was the jury admonished to disregard the witness's testimony regarding parole, the jury was further instructed that it must accept the stipulation that defendant was not on parole. We presume that the jury followed the trial court's admonition and accepted the stipulation (*People v. Boyette* (2002) 29 Cal.4th 381, 436), and we find no abuse of discretion in the trial court's ruling.

Defendant urges us to conclude, after examining the entire record, that the trial court abused its discretion because there is a reasonable probability of a result more favorable to defendant in the absence of Doe's reference to parole, citing *People v. Watson* (1956) 46 Cal 2d 818, 836. *Watson* requires us to determine the prejudicial effect of trial court error, which necessarily requires an examination of the entire record. But the threshold inquiry into whether error occurred is not so sweeping. Defendant sought a mistrial and the court denied that request during Doe's testimony. We look to that point in the trial and determine that no abuse of discretion occurred. Even assuming error for purposes of further *Watson* analysis, in light of the court's admonition and counsel's stipulation, we find no *probability* of an outcome more favorable to defendant had there been no mention of his parole status.

### III. DISPOSITION

The judgment is affirmed.

12

_____

Grover, J.

**WE CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

_____

Mihara, J.